# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WILLIAMS FIELD SERVICES GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 2019-0350-JTL |
| CAIMAN ENERGY II, LLC; ENCAP FLATROCK MIDSTREAM FUND II, L.P.; ENCAP ENERGY INFRASTRUCTURE FUND, L.P.; TT-EEIF CO-INVESTMENTS, LLC; UT EEIF SIDE CAR, LLC; LIC-EEIF SIDECAR, LLC; OAKTREE CAPITAL MANAGEMENT, L.P.; HIGHSTAR IV CAIMAN II HOLDINGS, LLC; FR BR HOLDINGS L.L.C.; JACK M. LAFIELD; RICHARD D. MONCRIEF; STEPHEN L. ARATA; WILLIAM R. LEMMONS, JR.; DENNIS F. JAGGI; STEVEN GUDOVIC; and BLUE RACER MIDSTREAM, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 29, 2019
Date Decided: September 25, 2019

William M. Lafferty, Kevin M. Coen, Lauren Neal Bennett, Sabrina Hendershot, Lauren P. Russell, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Andrew Ditchfield, Paul S. Mishkin, Daniel J. Schwartz, Tina Hwa Joe, Alexa B. Lutchen, Connie L. Dang, DAVIS POLK & WARDWELL LLP, New York, New York; *Counsel for Plaintiff Williams Field Services Group, LLC*.

Rolin P. Bissell, James M. Yoch, Jr., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Holmes, John C. Wander, Craig E. Zieminski, George M. Padis, Margaret D. Terwey, VINSON & ELKINS LLP, Dallas, Texas; *Counsel for Defendants Caiman Energy II, LLC, Jack M. Lafield, Richard D. Moncrief, Stephen L. Arata, Steven Gudovic, and Blue Racer Midstream, LLC*.

A. Thompson Bayliss, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Alan S. Goudiss, K. Mallory Brennan, Ryan Martin-Patterson, Susan Loeb, SHEARMAN &

STERLING LLP, *Counsel for Defendants EnCap Flatrock Midstream Fund II, L.P., EnCap Energy Infrastructure Fund, L.P., TT EEIF Co-Investments, LLC, UT EEIF Side Car, LLC, LIC-EEIF Side Car, LLC, Dennis F. Jaggi, and William R. Lemmons*.

Raymond J. DiCamillo, Robert L. Burns, Brian S. Yu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Paul C. Gluckow, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendants FR BR Holdings, L.L.C.*

Raymond J. DiCamillo, Robert L. Burns, Brian S. Yu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael J. Shipley, David A. Klein, KIRKLAND & ELLIS LLP, Los Angeles, California; *Counsel for Defendants Oaktree Capital Management, L.P. and Highstar IV Caiman II Holdings, LLC*.

**LASTER, V.C.**

This post-trial decision addresses the parties' competing requests for declaratory judgments that interpret the currently operative limited liability company agreement of Caiman Energy II, LLC ("Caiman II"). The parties agree that the LLC agreement gives EnCap Capital Management ("EnCap") the sole and exclusive right to cause Caiman II to approve an initial public offering that meets the definition of a "Qualified IPO." They further agree that the LLC agreement gives EnCap the sole and exclusive right to take any action that is "required or necessary to facilitate" a Qualified IPO. Their superficial agreement on these realities masks a fundamental disagreement on the scope of authority that these provisions confer.

The defendants read the provisions as granting plenary authority to EnCap in connection with a Qualified IPO, including the power to modify the definition of a Qualified IPO and to alter steps that the LLC agreement otherwise would require in connection with a Qualified IPO. Using the expansive authority that the defendants contend it possesses, EnCap has proposed an intricate, multi-step reorganization that will culminate in what the parties describe as an "Up-C IPO." EnCap's proposed transaction, however, is far more complex than a standard Up-C IPO. Among other things, it will invert the Caiman II entity structure, transforming Caiman II from its current status as the top-tier entity into a post-IPO role as the lowest-tier subsidiary. The defendants contend that EnCap has the authority to implement its Up-C IPO.

The plaintiff reads the same provisions narrowly as granting, at best, limited authority to EnCap to approve what the LLC agreement defines as a Qualified IPO, and then to take actions that are necessary to achieve an IPO that meets the contractual

definition. As the plaintiff sees it, EnCap cannot amend the definition of a Qualified IPO or evade otherwise mandatory steps for pursuing a Qualified IPO. More broadly, the plaintiff contends that EnCap cannot take action that would conflict with veto rights that the plaintiff possesses under other sections in the LLC agreement. The plaintiff concludes that EnCap lacks the authority to implement its Up-C IPO.

This decision interprets the plain language of the LLC agreement differently than either of the extreme positions taken by the parties. This decision concludes that EnCap has the power to implement certain steps in its proposed Up-C IPO, but lacks the power to implement others. This decision further concludes that EnCap cannot rely on a cooperation clause in the LLC agreement to compel the plaintiff to give up its contractual rights.

## I.    FACTUAL BACKGROUND

The parties reached agreement on fifty-four stipulations of fact. During two days of trial, the parties introduced 250 exhibits and lodged fourteen depositions in evidence. Seven fact witnesses testified live. What follows are the court's findings based on a preponderance of the evidence.[1]

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 138. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number. If a trial exhibit used paragraph or section numbers, then references are by paragraph or section.

## A.    Caiman I

In 2009, defendants Jack M. Lafield and Richard D. Moncrief formed Caiman Energy, LLC ("Caiman I"). Defendant Stephen L. Arata later joined the Caiman I management team. This decision refers to Lafield, Moncrief, and Arata as "Caiman Management."

Between 2009 and 2012, Caiman I acquired and developed midstream assets in the Marcellus Shale in West Virginia. In March 2012, Caiman I sold its assets to The Williams Companies, Inc. for $2.5 billion (the "Caiman I Sale"). As part of that transaction, Caiman Management entered into non-competition agreements that prohibited them from competing with their former business in its area of operations for a period of two years (the "Non-Compete Agreements").

## B.    Caiman II

In June 2012, three months after the Caiman I Sale, Caiman Management formed Caiman II. Through Caiman II, they planned to pursue the same midstream business model that Caiman I had used, this time in the Utica Shale in Ohio and Pennsylvania.

Caiman II obtained funding from many of the same investors who had backed Caiman I. EnCap committed $285 million.[2] Oaktree Capital Management ("Oaktree")

_____

[2] EnCap invested through five separate funds, each of which is a defendant and counterclaim plaintiff: EnCap Flatrock Midstream Fund II, L.P., EnCap Energy Infrastructure Fund, L.P., TT-EEIF Co-Investments, LLC, UT EEIF Side Car, LLC, and LIC-EEIF Side Car, LLC. *See* PTO ¶¶ 17–21. EnCap manages the funds, and the distinctions among the entities are not important for purposes of this decision, which refers generally to "EnCap." This simplified usage should not obscure the fact that the individual

3

committed $95 million.[3] Caiman Management committed approximately $29 million, and a smattering of other individuals invested. *See* JX 1, sched. I.

During the negotiations over the Caiman I Sale, Caiman Management had expressed interest in pursuing a follow-on venture, and Williams had expressed interest in investing. As a result, when Caiman Management formed Caiman II, they sought and obtained capital from Williams.[4] Williams committed $380 million, making it the largest investor in Caiman II.

Williams did not want Caiman Management to use Williams' capital to compete with the business that Williams had only recently purchased in the Caiman I Sale. *See* Armstrong Dep. 146–48; Scheel Dep. 175. Williams had protection for the first two years in the form of the Non-Compete Agreements, but once they expired, Williams could find

---

funds are the formal members of Caiman II and thus the parties that are bound by and have rights under its limited liability company agreement.

[3] Oaktree's predecessor firm, Highstar Capital, made the investment using defendant and counterclaim plaintiff Highstar IV Caiman II Holdings, LLC. *See* PTO ¶ 23. The distinctions between and among Oaktree, its predecessor, and the special purpose vehicle are not important for purposes of this decision, which refers generally to "Oaktree." As with the references to EnCap, this simplified usage should not obscure the fact that the special purpose vehicle is the formal member of Caiman II.

[4] Williams invested through its subsidiary, Williams Field Services Group, LLC, which is the plaintiff and counterclaim defendant. The distinction between The Williams Companies and Williams Field Services Group, LLC is not important for purposes of this decision. This decision therefore refers generally to "Williams." As with the references to EnCap and Oaktree, this simplified usage should not obscure the fact that Williams Field Services is the formal member of Caiman II.

itself in the position of having funded a competitor. To address this risk, Williams insisted on a geographic limitation that would restrict Caiman II to the Utica Shale.[5] Without the geographic limitation, Williams would not have invested in Caiman II.[6]

The geographic limitation was memorialized in Caiman II's original limited liability company agreement, dated as of July 9, 2012 (the "Original LLC Agreement"). In the initial draft, Caiman Management proposed that Caiman II could "acquire, own, hold, maintain, develop and operate Midstream Assets in the continental United States and the state and federal waters offshore thereto." JX 13 at '217. Williams struck the reference to the continental United States and its offshore waters, substituting "Utica Shale in Ohio and northwestern Pennsylvania." *Id.* at '217 to '218. Caiman Management accepted this change but added the language "and such other areas as determined by the Board with the approval required for a Special Voting Item." JX 14 at '550 to '551. In the final version of the Original LLC Agreement, Section 1.3 provided as follows:

> **Purpose**. The purposes for which [Caiman II] is organized are:
>
> (a)    to acquire, own, hold, maintain, develop and operate Midstream Assets in the Utica Shale in Ohio and northwestern Pennsylvania and such other areas as determined by the Board with the approval required for a Special Voting Item;
>
> (b)    to sell, abandon and otherwise Dispose of Midstream Assets; and
>
> (c)    to engage in or perform any and all activities that are related to or incident to the foregoing or otherwise authorized by the Board in

---

[5] *See* Miller Tr. 467; Reaves Tr. 587–89; Miller Dep. 24–25; Armstrong Dep. 143–48; Carmichael Dep. 42–44; Lemmons Dep. 22, 31; Scheel Dep. 39–40, 175.

[6] *See* Scheel Tr. 73–74; Armstrong Tr. 23–25; JX 31 at 5.

accordance with the terms of this Agreement, and that may be lawfully conducted by a limited liability company under the Act.

In carrying out the business and purposes of [Caiman II], [Caiman II] may act directly or indirectly through one or more entities.

*See* JX 17, § 1.3 (formatting altered). This decision refers to this language as the "Original Purpose Clause."

Clause (a) of the Original Purpose Clause limited Caiman II's operations to "the Utica Shale in Ohio and northwestern Pennsylvania *and such other areas as determined by the Board with the approval required for a Special Voting Item.*" *See id.* (emphasis added). The concept of a "Special Voting Item" referenced an aspect of Caiman II's governance regime. Under the Original LLC Agreement, Caiman II was a manager-managed LLC with a nine-member board of managers (the "Board"). Williams received the right to designate three of the members of the Board; it designated Curt Carmichael, David Keylor, and T.J. Rinke (the "Williams Managers"). EnCap received the right to designate two of the members of the Board; it designated William R. Lemmons, Jr. and Dennis F. Jaggi (the "EnCap Managers"). Oaktree received the right to designate one member of the Board; it designated Steven Gudovic (the "Oaktree Manager"). Caiman Management held the remaining three seats. *See* PTO ¶ 37.

The Original LLC Agreement provided that as a general matter, valid Board action required a number of votes equal to or exceeding a majority of the managers then entitled to be designated to the Board. *See* JX 17, §§ 6.1, 6.8(a). In other words, with nine managers entitled to be designated to the Board, valid Board action required five votes. But the Original LLC Agreement then identified a list of eleven additional matters, each defined

6

as a "Special Voting Item," for which valid Board action also required "the affirmative vote of at least one EnCap Manager and at least one [Williams] Manager." *See id.* § 6.8(b). If either EnCap or Williams opposed a Special Voting Item, their representatives could block it by withholding support, even if a majority of the Board otherwise approved.

By providing that Caiman II could only operate outside of the Utica Shale "as determined by the Board with the approval required for a Special Voting Item," Clause (a) of the Original Purpose Clause required approval from at least one EnCap Manager and at least one Williams Manager. As a result, Caiman II would not be able to operate outside the Utica Shale without both EnCap's and Williams' consent. Making this agreement doubly clear, the list of Special Voting Items included taking "any action that is inconsistent with [Caiman II's] purpose, as set forth in Section 1.3." *Id.* § 6.8(b)(x).

Other pertinent Special Voting Items included:

(iii)    unless such matter is a Major Special Voting Item, to merge, combine, or consolidate [Caiman II] with any other entity, convert [Caiman II] into another form of entity, or exchange interests in [Caiman II] with any other person (except as part of a Drag-Along Sale effected pursuant to Section 9.3);

\* \* \*

(xi)    to approve a Qualified IPO; or

(xii)    to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise omit to any of the foregoing.

*Id.* § 6.8(b).

As indicated by item (iii) in this list, the Original LLC Agreement identified an additional category of Board actions known as "Major Special Voting Items." *See id.* § 6.8(c). For these items, Board approval required the affirmative vote of one EnCap

7

Manager. *Id.* A Major Special Voting Item could *not* be approved by any other means, meaning that a single EnCap Manager could determine unilaterally whether to approve a Major Special Voting Item. *Id.* The list of Major Special Voting Items in the Original LLC Agreement identified only one substantive item, followed by a general catchall for actions related to that item:

(i)     subject to the applicable requirements of <u>Section 9.7</u>, to enter into or consummate any transaction that will constitute an Exit Event, including

the Disposition of all or substantially all of the assets of [Caiman II] (including by way of Disposition of all or any portion of any equity interests held by [Caiman II] or its subsidiaries),

the Disposition of all of the Membership Interests as a Drag-Along Sale effected pursuant to <u>Section 9.3</u>, or

a merger of [Caiman II] with and into another entity or pursuant to which [Caiman II] is not the surviving entity (any such transaction approved pursuant to this <u>Section 6.8(c)</u>, a "<u>Company Sale</u>"), or

(ii)    to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

*Id.* (formatting altered). The possibility of effectuating an Exit Event through a "Drag-Along Sale" referred to Section 9.3 of the Original LLC Agreement, which gave EnCap the right to cause the Board to approve and Caiman II to engage in "a sale of [Caiman II] that will be an Exit Event . . . structured as a sale of the Membership Interests." *Id.* § 9.3(a).

By making the effectuation of an Exit Event a Major Special Voting Item, Section 6.8(c)(i) gave EnCap the unilateral ability to cause the Board to approve and Caiman II to consummate an Exit Event. Consistent with the examples included in Section 6.8(c)(i), the Original LLC Agreement defined "Exit Event" as

the sale of [Caiman II], in one transaction or a series of related transactions, whether structured as

(i) a sale or other transfer of all or substantially all of the Equity Securities (including by way of merger, consolidation, share exchange, or similar transaction),

(ii) the sale or other transfer of all or substantially all of the assets of [Caiman II], promptly followed by a dissolution and liquidation of [Caiman II],

(iii) any other dissolution or liquidation of [Caiman II], or

(iv) a combination of any of the foregoing.

*Id.* § 2.1 (formatting altered).

Although EnCap had the unilateral ability to cause the Board to approve and Caiman II to consummate an Exit Event, the exercise and implementation of that right was not unfettered. EnCap's rights under Section 6.8(c)(i) were "subject to the applicable requirements of Section 9.7." In that section, Williams had a right of first offer under which EnCap had to provide Williams with written notice of the proposed Exit Event, then negotiate in good faith with Williams

> with respect to a transaction pursuant to which [Williams] would consummate an Exit Event pursuant to which [Williams] would acquire all of the Equity Interests (if a Drag-Along Sale), all of the assets of [Caiman II] (if a Company Sale) or all of the assets of [Caiman II] to be sold (if a Material Asset Sale) . . . .

*Id.* § 9.7(b). EnCap's right to effectuate a Drag-Along Sale under Section 9.3 was likewise subject to Williams' right of first offer in Section 9.7. *Id.* § 9.3(b).

Through its right of first offer, Williams had the opportunity to consummate the Exit Sale itself. By doing so, Williams could avoid the prospect of a new owner buying Caiman

9

II, eliminating the Original Purpose Clause, and using Caiman II to compete with the business that Williams had purchased from Caiman I.

## C. The Dominion Transaction

In fall 2012, Caiman II identified an opportunity to partner with Dominion Energy, Inc. ("Dominion") to form a joint venture that Caiman Management would manage (the "Dominion Transaction"). In November, Caiman II and Dominion negotiated a letter of intent, and Caiman II formed a wholly owned subsidiary called Blue Racer Midstream LLC ("Blue Racer") to serve as the vehicle for the Dominion Transaction. *See* JX 20; JX 21; JX 34 at 1. Blue Racer became and remains Caiman II's only revenue producing asset. It is also the only entity through which Caiman II does business.

In December 2012, Dominion effectuated the first step of the Dominion Transaction by causing its wholly owned subsidiary, Dominion Natrium Holdings, Inc., to contribute certain midstream assets to Blue Racer in exchange for cash at closing. Dominion also committed to cause Dominion Natrium to contribute additional assets over time in return for additional cash payments to be funded by Caiman II. As part of the Dominion Transaction, Dominion received equity interests reflecting a 50% ownership interest in Blue Racer, leaving Caiman II with the remaining 50% ownership interest. *See generally* JX 31; JX 33.

In connection with the Dominion Transaction, Caiman II and Dominion entered into a new limited liability company agreement for Blue Racer. *See* JX 34 (the "Blue Racer LLC Agreement"). At around the same time, the members of Caiman II entered into an amended and restated limited liability company agreement for Caiman II. *See* JX 1. This

agreement is still the operative agreement that governs Caiman II, so this decision refers to it as the "Caiman LLC Agreement."

When entering into the Blue Racer LLC Agreement and the Caiman LLC Agreement, the parties addressed a variety of issues. Two are pertinent to the current dispute: (i) a modification to the geographic area in which Caiman II and Blue Racer would operate, and (ii) a restructuring of EnCap's exit rights.

### 1. Geographic Scope

Dominion contributed assets to Blue Racer that included certain assets located in West Virginia, near the assets that Williams had purchased in the Caiman I Sale. Under the Original Purpose Clause, Caiman II could not operate in West Virginia, and Caiman II would have violated the Original Purpose Clause by engaging in business in West Virginia through Blue Racer. The parties addressed this problem by including a modified geographic limitation in the Blue Racer LLC Agreement, then using that modified scope to frame a revised purpose provision in the Caiman LLC Agreement.

The Blue Racer LLC Agreement addressed the geographic situation by defining the "Purposes of the Company" as follows:

> [Blue Racer] is formed for the purposes of developing the business of wet gas, lean gas, crude and condensate gathering, processing, and fractionation and NGL transportation within the AMI Area and, to the extent necessary for owning, operating and expanding the TL-404 Gathering Line, the Natrium Facility and G-150 Pipeline, within West Virginia (collectively, the "**Company Business**"). Each of the Members agrees to cause [Blue Racer] to conduct, directly and through its subsidiaries, the Company Business in accordance with the provisions of this Agreement and the Act.

11

JX 34, § 3.1 (the "Blue Racer Purpose Clause"). The Blue Racer LLC Agreement defined "AMI Area" as "the area of the Utica Shale formation, specifically the counties in the State of Ohio and the Commonwealth of Pennsylvania set forth in Schedule 3, as may be modified pursuant to Section 10.4."[7] The Blue Racer Purpose Clause thus limited Blue Racer to operating in this area, except that Blue Racer could operate within West Virginia "to the extent necessary for owning, operating and expanding the TL-404 Gathering Line, the Natrium Facility and G-150 Pipeline." *Id.* § 3.1. These were specific assets that Dominion Natrium contributed to Blue Racer as part of the Dominion Transaction.

The Caiman LLC Agreement addressed the geographic situation with a new purpose clause. Section 1.3 of the Caiman LLC Agreement provided as follows:

**Purpose**. The purposes for which [Caiman II] is organized are:

(a) to acquire, own, hold, maintain, develop and operate Midstream Assets in the Utica Shale in Ohio and northwestern Pennsylvania, including all those areas covered by the AMI Area and, to the extent necessary for owning, operating and expanding the Natrium Facility, the G-150 Pipeline and the TL-404 Gathering Line, within West Virginia (provided that, except for the Replacement Natrium Processing Contracts (as such term is defined in the Blue Racer Investment Agreement), neither [Caiman II] nor its subsidiaries may enter into, or cause Blue Racer or its subsidiaries to enter into, new gathering, processing or fractionation agreements for hydrocarbons produced in West Virginia prior to April 27, 2014), and such other areas as determined by the Board with the approval required for a Special Voting Item;

---

[7] *Id.* at A-1. Schedule 3 of the Blue Racer LLC Agreement listed thirty-five counties in Ohio and five counties in Pennsylvania. Pursuant to Section 10.4, Dominion could remove certain counties from the AMI Area under specified circumstances. *Id.* § 10.4. This aspect of the Blue Racer LLC Agreement is not at issue.

(b)     to sell, abandon and otherwise Dispose of Midstream Assets; and

(c)     to engage in or perform any and all activities that are related to or incident to the foregoing or otherwise authorized by the Board in accordance with the terms of this Agreement, and that may be lawfully conducted by a limited liability company under the Act.

In carrying out the business and purposes of [Caiman II], [Caiman II] may act directly or indirectly through one or more entities. Notwithstanding the foregoing, prior to the Equalization Date, [Caiman II] shall not pursue any Operation and Enhancement Plans except through Blue Racer and its subsidiaries.

JX 1, § 1.3 (formatting altered; the "Caiman Purpose Clause").

To ensure that the Blue Racer Purpose Clause and the Caiman Purpose Clause (together, the "Purpose Clauses") tracked each other, the Caiman LLC Agreement defined the term "AMI Area" to have "the meaning set forth in the Blue Racer LLC Agreement." *Id.* § 2.1. Recognizing that the scope of the Caiman Purpose Clause now turned on a definition in the Blue Racer LLC Agreement, the Caiman LLC Agreement expanded the list of Special Voting Items to include any action "to amend, modify or otherwise change (including by waiver or consent . . .) in any material respect any Blue Racer Agreement, including but not limited to an amendment of the definition of 'AMI Area' or 'ROFO Development Opportunity' under the Blue Racer Agreements . . . ." JX 1, § 6.8(b)(xii).[8]

As a result of these changes, both before and after the Dominion Transaction, Caiman II could not compete with the business that Williams had purchased in the Caiman I Sale. The Caiman Purpose Clause only permitted Caiman II to operate in West Virginia

---

[8] The provision authorized limited changes pursuant to exceptions not relevant here.

to the extent necessary to own, operate, or expand the specific assets it received in the Dominion Transaction. Otherwise, Caiman II could not operate outside of the Utica Shale. Before Caiman II could operate anywhere else, it had to receive the approval of *both* one EnCap Manager *and* one Williams Manager. Caiman II could not violate this limitation directly or indirectly, whether through Blue Racer or otherwise. Blue Racer also could not operate outside of that same designated area, and Caiman II could not authorize any change in this aspect of the Blue Racer LLC Agreement without the approvals necessary for a Special Voting Item. As a result, neither Caiman II nor Blue Racer could operate outside of their designated area without Williams' consent.

### 2. Exit Rights

A more significant set of changes to the Original LLC Agreement involved the members' exit rights. This issue arose because the Blue Racer LLC Agreement contemplated that Dominion Natrium would contribute additional assets to Blue Racer in exchange for cash, and it obligated Caiman II to provide the capital necessary for Blue Racer to finance those transactions. *See* JX 22. During the lead up to the Dominion Transaction, Williams submitted a proposal to Caiman Management under which Williams would fund 100% of the required capital in return for additional member interests in Caiman II, which would result in Williams holding up to a 66% ownership interest in Caiman II. JX 24. In exchange for this commitment, Williams' proposal contemplated that an Exit Event would no longer be a Major Special Voting Item that EnCap could control unilaterally. *See id.*; *see also* JX 23.

14

Knowing that EnCap would be focused on its need to exit as its funds entered their harvesting stage, Caiman Management questioned whether EnCap would be willing to give up its control over an Exit Event. But Caiman Management believed a compromise was possible, because they foresaw that the most likely outcome for Caiman II was either a sale to Williams or an IPO, and Caiman Management believed an IPO would likely generate greater value for EnCap. Caiman Management therefore thought that EnCap might be willing to give up its control over an Exit Right in return for greater control over an IPO. *See* JX 23.

In crafting a counteroffer that would be acceptable to both Williams and EnCap, Caiman Management proposed swapping the approvals required for an Exit Event and a Qualified IPO. Under the Caiman Management proposal, an Exit Event would become a Special Voting Item, and a Qualified IPO would become a Major Special Voting Item only requiring the approval of an EnCap Manager. JX 25. Caiman Management also proposed that in the event of a Qualified IPO that was structured through a master limited partnership ("MLP"), the other investors in Caiman II "will sell their GP interest for cash to [Williams] using a defined valuation mechanism." *Id.* at '146. At the time, publicly traded midstream businesses were invariably organized as MLPs, and the parties expected Caiman II to go public as an MLP. Under this proposal, Williams would have the right to purchase all of the general partner interests in the MLP and control the post-IPO entity. The Caiman Management proposal also reduced Williams' maximum capital contribution and resulting equity stake from 66% to 62.5%. *See id.* In addition, Caiman Management proposed that the geographic restrictions in the Caiman LLC Agreement and the Blue Racer LLC

15

Agreement would fall away once Caiman II had satisfied all of its funding commitments to Blue Racer. *See id.* at '147; JX 34 at A-6.

Caiman Management ran its proposal by EnCap. *See* JX 26. EnCap struck the language eliminating its right to force an Exit Event, but kept the language that would let it unilaterally approve a Qualified IPO. Caiman Management sent the amended proposal to Williams. *See* JX 28. Williams restored the language eliminating EnCap's right to force an Exit Event and struck the point about the geographic restrictions falling away. *See* JX 30.

The parties reached an agreement in principle based on Williams' counterproposal. Looking back on the negotiations from May 2014, Arata summarized the basic deal as follows:

> When [Blue Racer] was formed, [Williams] negotiated for the option to increase its interest in Caiman II to 62.5%. An additional element of this change was [Williams'] request to not be able to be dragged into a sale of Caiman II (as they would now most likely be a majority owner of Caiman II). This was agreed to on the condition of [EnCap] being allowed to drag [Williams] into an IPO of either [Blue Racer] or Caiman II. The final element of the change of control adjustments was that, in the event of an IPO of either [Blue Racer] or Caiman II, [Williams] would have the right to buy out the other Caiman II owners' interest in the GP of Caiman II for fair market value in cash at the closing of the IPO (with an agreed upon process for resolving a valuation dispute).

JX 46 at '757 to '758.

The lawyers implemented the business deal in the Caiman LLC Agreement. To document the agreement regarding an Exit Event, the Caiman LLC Agreement (i) struck Section 9.3 of the Original LLC Agreement in its entirety, thereby eliminating the concept of a Drag-Along Sale, and (ii) moved the approval of an Exit Event from Section 6.8(c)(i),

16

where it was a Major Special Voting Item, to Section 6.8(b)(xi), where it became a Special Voting Item. In a related change, the parties revised Section 6.8(b)(iii), which made it a Special Voting Item "to merge, combine, or consolidate [Caiman II] with any other entity, convert [Caiman II] into another form of entity, or exchange interests in [Caiman II] with any other person." Previously, this provision included an exception that recognized EnCap's right to authorize a merger or similar transaction as a Major Special Voting Item when it was part of an Exit Event. JX 17, § 6.8(b)(iii). The Caiman LLC Agreement eliminated that exception.

To document the agreement regarding a Qualified IPO, the Caiman LLC Agreement moved the approval of a Qualified IPO from Section 6.8(b)(xi), where it had been a Special Voting Item, to Section 6.8(c)(i), where became a Major Special Voting Item. As a result, the list of Major Special Voting Items in the Caiman LLC Agreement consisted of the following:

> (i)      to approve a Qualified IPO, or

> (ii)     to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

*Id.* § 6.8(c).

The Caiman LLC Agreement did not make any changes to the definition of a Qualified IPO. Both in the Original LLC Agreement and in the Caiman LLC Agreement, a "Qualified IPO" was defined as

> any underwritten initial public offering by the IPO Issuer of equity securities pursuant to an effective registration statement under the Securities Act for which aggregate cash proceeds to be received by the IPO Issuer from such offering (without deducting underwriting discounts, expenses and

17

commissions) are at least $75,000,000; provided that a Qualified IPO shall not include an offering made in connection with a business acquisition or combination pursuant to a registration statement on Form S-4 or any similar form, or an employee benefit plan pursuant to a registration statement on Form S-8 or any similar form.

*Id.* § 2.1(a); JX 17, § 2.1(a).

The definition of "Qualified IPO" referred to the concept of the "IPO Issuer," and the Caiman LLC Agreement changed that definition. It now stated:

"IPO Issuer" means (i) [Caiman II] or (ii) an Affiliate of [Caiman II] that will be the issuer in a Qualified IPO. For the avoidance of doubt, and without limiting the definition of Affiliate, Blue Racer and its subsidiaries will be considered Affiliates of [Caiman II] for purposes of this definition.

JX 1, § 2.1(a). The qualification "[f]or the avoidance of doubt" was an addition. It made clear that Blue Racer or one of its subsidiaries could be the IPO Issuer.

In the Original LLC Agreement, Section 9.5 governed the implementation of a Qualified IPO, and in the Caiman LLC Agreement, the parties made relatively limited changes to this set of provisions. *See* JX 1, § 9.5 (the "Qualified IPO Section"). To implement the agreement regarding who could control a Qualified IPO, the parties added language to Section 9.5(a) to make clear that (i) the decision to effectuate a Qualified IPO was a Major Special Voting Item and (ii) any references to approvals by the Board in Section 9.5 meant the approval necessary for a Major Special Voting Item, *i.e.*, EnCap's sole approval. *See* JX 1, § 9.5(a).

The only other significant modification to the Qualified IPO Section addressed Williams' right to acquire 100% of the general partner interest in the event of a Qualified IPO involving an MLP, which the Caiman LLC Agreement defined as an "MLP

18

Conversion." To implement this agreement, the parties added a new Section 9.5(e) which granted Williams "the sole and exclusive right to purchase each other Investor's Equity Interests in the general partner, including any incentive distribution rights and similar incentive securities" for cash in an amount equal to "fair market value." *See* JX 1, § 9.5(e). The new section included a mechanism for determining fair market value, including for the appointment of an appraiser. *See id.*

In January 2013, weeks after executing the Caiman LLC Agreement, Williams prepared a summary of its terms. The summary of the Qualified IPO Section stated: "Actions requiring Board approval in connection with a Qualified IPO are considered Major Special Voting Items (as defined below), which require the affirmative vote of one EnCap Manager and no other." JX 35 at '448.

## D. The Contemplated MLP Conversion In 2015

Beginning in early 2014, Caiman Management explored the possibility of conducting a Qualified IPO, believing initially that it "would optimally be timed in early Q2 of 2015." JX 46 at '757; *see* PTO ¶ 38; JX 55. Publicly traded midstream companies continued to be organized as MLPs, and Caiman Management expected that a Qualified IPO would take place through an MLP Conversion.

Caiman Management did not want the MLP to face geographic restrictions and asked their outside counsel whether the restrictions would apply. In an email sent in May 2014, counsel expressed the view that

> the restrictions in the Caiman II purpose clause would naturally fall away at a Caiman II level at IPO b/c we will have a new partnership agreement, however, absent amending the Blue Racer LLC Agreement, Caiman II would

19

> still be limited by the purpose clause in Blue Racer to the extent it is pursuing activities through Blue Racer.

JX 43 at '328. After receiving this advice, Caiman Management and EnCap discussed how to negotiate with Williams over removing the Blue Racer Purpose Clause. *See* JX 46 at '758. Their discussions assumed that the amendment would require Williams' consent. *See id.*

When EnCap engaged with Williams about the Qualified IPO, Williams suggested the possibility of buying Caiman II. *See* JX 50 at '021. For a time, the discussions focused on a sale of Caiman II to Williams. *See* JX 59.

In November 2014, with the discussions over a sale bogging down, Caiman Management resumed their preparations for an MLP Conversion. Caiman Management anticipated that Williams would exercise its right to acquire 100% of the general partner and asked Williams to confirm that fact. Notwithstanding the advice they had received six months earlier about the Caiman Purpose Clause "fall[ing] away," Caiman Management asked Williams to agree that the Purpose Clauses would be removed post-IPO "as they would be unduly restrictive for marketing purposes." JX 70. Caiman Management argued this should be an easy concession for Williams because if Williams exercised its right to acquire 100% of the general partner, then Williams "will be in joint control of [Blue Racer] at that point" and could ensure that the MLP and Blue Racer did not expand into the Marcellus Shale. *Id.*

In January 2015, counsel for Caiman II prepared a draft Form S-1. It disclosed as a risk factor that both the MLP's limited partnership agreement and the Blue Racer LLC

20

Agreement would "limit[] our ability to expand [our or] Blue Racer's operations beyond the Utica Shale and certain portions of the Marcellus Shale." JX 71 at '139 (bracketed text in original). A drafting note from counsel called for confirming with Williams whether this disclosure needed to be retained, or whether Williams would agree to eliminate the geographic restrictions: "***NTD: confirm [Williams] intent to leave purpose limitation in place***." *Id.* Williams "held to the position that we did want to maintain [the business purpose limitation], and that it should be in the [S-1] disclosures." Carmichael Tr. 124.

Caiman II subsequently filed a preliminary Form S-1 on a confidential basis with the SEC on May 13, 2015. JX 77 at '710. The as-filed Form S-1 included the same risk factor language and contained additional disclosures regarding how the business purpose provisions would limit the operations of the post-IPO entities. It stated that the "sole purpose" of Caiman II and Blue Racer was "pursuing midstream energy opportunities in the Utica Shale." *Id.* at '716. It later stated that "Blue Racer's assets are exclusively located in . . . the Utica Shale and certain adjacent areas in the Marcellus Shale, and the Blue Racer LLC Agreement restricts it from engaging in operations outside of this area." *Id.* at 749. The as-filed version added that "entry into any business other than the company's stated purposes" would require approval of members holding 100% of Blue Racer's member interests. *Id.* at '763 to '764. *See generally* PTO ¶¶ 38–43.

## E.     The Contemplated MLP Conversion In 2017

Because of adverse market conditions, Caiman II did not proceed with the MLP Conversion in 2015. Caiman Management revisited the prospect of an MLP Conversion in 2017. This time, Caiman Management did not assume that Williams would exercise its

right to acquire 100% of the MLP's general partner and proceeded with the expectation that the Form S-1 would have to disclose both the possibility that Williams would exercise its option and the possibility that the general partner would have multiple members. As before, Caiman Management wanted to remove the business purpose limitations, but did not believe it could be done without Williams' consent. *See* Juban Dep. 111; *see also* JX 137 at '828. When Caiman II filed a new Form S-1 confidentially in 2017, it disclosed that the business purpose provisions would limit the ability of IPO Issuer and Blue Racer to operate and discussed the resulting implications for investors.[9]

While Caiman Management was preparing for the 2017 MLP Conversion, Williams supported the Qualified IPO, but proceeded slowly and deliberately. Williams had a contractual obligation to support a Qualified IPO, and it took care to comply with that obligation, but it also sought to limit its support to what was contractually required. At the same time, Williams continued to dangle the possibility of a purchase of Caiman II. By February 2017, little progress had been made, and Caiman Management and EnCap had

---

[9] JX 126 at '461 ("Our limited partnership agreement and Blue Racer's limited liability company agreement . . . limit our ability to expand our or Blue Racer's operations beyond the Utica Shale and certain portions of the Marcellus Shale."); *id.* at '466 (disclosing that Caiman II was formed "for the sole purpose of pursuing midstream energy opportunities in the Utica Shale"); *id.* at '473 (disclosing that Blue Racer was formed "for the limited purpose of" operating in Ohio and Pennsylvania); *id.* at '475 (disclosing that the Blue Racer Agreement "restricts [Blue Racer] from engaging in operations outside of the Utica Shale and certain adjacent areas in the Marcellus Shale"); *id.* at '500 (same); *id.* at '515 to '516 (disclosing as a risk factor that "entering into any business for any purpose other than the company's stated purposes" would require approval from holders of 100% of Blue Racer's member interests).

grown frustrated with Williams. *See* JX 112 at '132, JX 113 at '193. Those dynamics persisted through the balance of 2017. *See, e.g.*, JX 140; JX 141; JX 142; JX 149; JX 154.

Unfavorable market conditions in late 2017 put an end to the prospect of the MLP Conversion. In June 2018, when Caiman Management tried to re-start the IPO process. EnCap did not support the idea, believing it was "a waste of time unless Williams is on board." JX 162.

## F.     First Reserve Buys Out Dominion.

In September 2018, a private equity firm named First Reserve Corporation contacted EnCap. First Reserve was exploring a purchase of Dominion's interest in Blue Racer but did not want to buy in without a path to liquidity. First Reserve proposed that the two private equity firms work together to achieve an Up-C IPO of Blue Racer in 2019 or 2020 to open the door to secondary offerings that would enable them to exit from their positions. *See* JX 163.

By agreement dated October 31, 2018, a subsidiary of First Reserve committed to purchase Dominion's interest in Blue Racer. The acquisition closed on December 14, 2018. PTO ¶ 44. Through this transaction, First Reserve replaced Dominion as the other 50% member in Blue Racer. *Id.* Under an agreement also dated October 31, 2018, the same subsidiary of First Reserve and EnCap committed to work together to achieve an IPO of Blue Racer. *See* JX 167.

## G.     The Up-C IPO

After hearing from First Reserve, Caiman Management and EnCap began exploring the possibility of an Up-C IPO. *See* JX 165. In this structure, an existing limited liability

23

company that is taxed as a pass-through entity undertakes a public offering through a newly formed corporation ("NewCo"), which is structured as a holding company that owns an interest in the LLC. The basic steps in a typical Up-C are as follows:

- NewCo issues Class A common stock to the public in an IPO, with the Class A stock carrying both economic rights and voting rights.

- NewCo uses the proceeds from the IPO to purchase member interests in the LLC, giving NewCo an ownership interest in the LLC and diluting the ownership interest of the pre-IPO owners (the "Sponsors").

- The Sponsors retain their pre-IPO member interests in the LLC, for which they continue to receive pass-through tax treatment.

- The Sponsors receive Class B common stock in NewCo, with the Class B stock carrying voting rights but no economic rights. The voting rights allocated to the Class B shares track the equity interest reflected by the Sponsor's member interests in the LLC.

- NewCo is designated as the managing member of the LLC and is governed by a board of directors elected by the Class A and Class B stockholders of NewCo.

- Each Sponsor can exchange a member interest in the LLC and the corresponding shares of Class B stock for an equivalent amount of Class A stock.

*See* JX 184 at '716. Although EnCap and Caiman Management ultimately sought to move forward with what they have called an Up-C IPO, their version is far more complex and involves many more steps than the typical Up-C transaction. *See* JX 225.

During their initial exploration of an Up-C IPO, Caiman Management and EnCap did not perceive it as a means of eliminating the Purpose Clauses. Instead, during March 2019, Caiman Management explored whether they could induce Williams to agree to change the Purpose Clauses, either by invoking their ability to exclude Williams from decisions about "competitive activities" or by withholding consent to a transaction that Williams wanted to pursue. *See* JX 180; JX 182; Arata Tr. 413–14, 419–20.

24

Around the same time, Arata suggested that maybe Williams would "lose[] the right to vote regarding changes to the business purpose clause in connection with the IPO." JX 181. The general counsel of Caiman II shot down that idea. After citing some points that might support Arata's argument, he asked outside counsel, "[W]e can't use the IPO reorg to strip Williams of rights it currently has, correct? Or have I missed something somewhere?" JX 181. Although the same counsel had expressed the view in an email five years earlier that the Caiman Purpose Clause would fall away in an IPO if there was a new entity, no one gave that advice at this point. Arata also texted with First Reserve about his idea of using an Up-C IPO to eliminate the Purpose Clauses. This was the first time First Reserve had heard of the idea. *See* JX 182.

Later in March 2019, EnCap informed Williams that it was once again considering a Qualified IPO. Caiman Management and EnCap subsequently called a special meeting of the Board to consider moving forward with a Qualified IPO of Blue Racer "or an entity formed for such purpose" and to

> [a]uthorize management . . . to hire advisors, form, merge or consolidate entities, draft and file registration statements, file documents with such regulatory authorities as management deems necessary or appropriate and to take or cause to be taken any and all actions as and to the extent necessary to effectuate a Qualified IPO of Blue Racer.

JX 185. Williams recognized that "EnCap has a right to take Caiman or [Blue Racer] public" and told Caiman Management that Williams would support the IPO "if our agreement rights are maintained." JX 186; *see* JX 188. During a meeting on April 5, 2019, the Board unanimously approved the proposed resolutions. PTO ¶ 46.

On April 17, 2019, the Board held an organizational meeting to discuss the Qualified

IPO. PTO ¶ 49. The Up-C structure as presented involved at least the following steps.

- Step One: Form three new entities.

  o Caiman Ohio Midstream, LLC ("Ohio Midstream"), an existing holding
    company through which Caiman II holds its 50% interest in Blue Racer, forms
    a wholly owned subsidiary called Blue Racer Midstream Inc. ("PubCo").

  o PubCo forms a wholly owned subsidiary called Blue Racer Midstream Holdings,
    LLC ("HoldCo").

  o HoldCo forms a wholly owned subsidiary called BR Holdco Merger Sub, LLC
    ("Holdco Merger Sub").

- Step Two: Caiman II and Dominion amend and restate the Blue Racer LLC
  Agreement to convert Blue Racer's member units into a single class.

- Step Three: Caiman II contributes its retained assets to Ohio Midstream, except for
  its ownership interest in Ohio Midstream.

- Step Four: Ohio Midstream distributes all of its Blue Racer units to Caiman II.

- Step Five: Caiman II distributes all of its newly received Blue Racer units to its
  members.

- Step Six: Caiman II distributes its ownership interest in Ohio Midstream to Caiman
  Management.

- Step Seven: Blue Racer forms a wholly owned subsidiary called BRM Merger Sub
  LLC.

- Step Eight: Caiman II merges with and into BRM Merger Sub LLC, with Caiman
  II surviving as a new entity named Blue Racer Midstream Management LLC.

- Step Nine: PubCo issues (i) Class A shares to the public in exchange for cash,
  contributing the cash to HoldCo, (ii) contributes Class B shares to Holdco, and (iii)
  agrees with Ohio Midstream to cancel Ohio Midstream's interest in PubCo.

- Step Ten: HoldCo Merger Sub merges with and into Blue Racer, with Blue Racer
  surviving as a wholly owned subsidiary of HoldCo and former unitholders of Blue
  Racer receiving a combination of cash raised in the IPO, Class B stock in PubCo,
  and units of HoldCo.

26

*See* JX 184 at '722 to '728.

At the meeting, Caiman Management asked Williams to consent to the removal of the Purpose Provisions. *See* JX 194 at '109. The lead Williams representatives said that Williams would not consent. Carmichael Tr. 147.

## H.    The Defendants Develop Their Strategy.

Toward the end of April 2019, the defendants focused on using the Up-C IPO to eliminate the Purpose Clauses. On April 30, 2019, Caiman Management informed Williams that the Board would meet on May 7 to consider whether to remove the Purpose Clauses from the Caiman LLC Agreement and the Blue Racer LLC Agreement. During this call, Caiman Management mentioned that "maybe" Williams' consent would not be required to remove the provisions in an IPO. Carmichael Tr. 151–52. This was the first time anyone had expressed that view to Williams. *Id.* at 152.

On May 2, 2019, two EnCap representatives had a discussion with EnCap's outside counsel about the "BRM purpose clause." JX 241; Lemmons Tr. 543–44. The next day, Caiman Management, EnCap, and First Reserve had a call about "strategy wrt [W]illiams and [the] purpose clause." JX 213; *see* Reaves Tr. 612–13. After the meeting, Caiman II's Chief Financial Officer exchanged text messages with an EnCap representative about using a new entity to circumvent the Purpose Clauses. They decided that the idea would not work *See* JX 212.

Three days later, on May 6, 2019, the board of managers of Blue Racer voted to amend the Blue Racer Purpose Clause to eliminate any geographic restrictions, subject to approval from the board of Caiman II. PTO ¶ 50. On May 7, 2019, the Board met to

27

consider changing the Purpose Clauses. Caiman Management formally proposed to amend the Caiman Purpose Clause to eliminate any geographic restriction and to approve the conditional amendment to the Blue Racer Purpose Clause that the Blue Racer board had approved. *See* JX 222; JX 223. The lead Williams representative stated that Williams would not consent to the proposed changes. The Williams Managers did not vote in favor of the proposal, causing it to fail. *See* JX 220; PTO ¶ 51.

On May 8, 2019, Caiman Management advised Williams that although the Purpose Clauses could not be changed without Williams' consent outside of an IPO, Caiman II could amend the Purpose Clauses as part of a Qualified IPO. PTO ¶ 52; Lafield Dep. 163−64. Before May 8, no one had taken this positon.

Later in May 2019, Blue Racer filed a confidential Form S-1 for its IPO. In it, Blue Racer described the Up-C IPO somewhat differently, characterizing it as having the following steps:

- "Blue Racer LLC's limited liability company agreement will be amended and restated to, among other things, create a single class of units in Blue Racer LLC, referred to herein as 'Blue Racer Units,' held by First Reserve, and following a distribution by Caiman of the Blue Racer Units to its members, the Legacy Caiman Owners[.]"

- "Holdco's limited liability company agreement will be amended and restated to, among other things and as described further under 'Certain Relationships and

28

Related Party Transactions—Limited Liability Company Agreement of Holdco,' create a single class of units in Holdco, referred to herein as 'Holdco Units[.]'"

- "[W]e will issue        Class A shares to the public in this offering, representing 100% of the economic rights in Blue Racer Inc., at an initial offering price of $ per share (the midpoint of the price range set forth on the cover page of this prospectus)[.]"

- "[W]e will issue and contribute Class B shares and a portion of the net proceeds received in the offering to Holdco in exchange for Holdco Units[.]"

- "Holdco will form a merger subsidiary, which will merge with and into Blue Racer LLC, with Blue Racer LLC surviving the merger as a wholly-owned subsidiary of Holdco and the Existing Owners receiving, as merger consideration, their allocable amounts of Holdco Units and a number of Class B shares equal to the number of Holdco Units received by such Existing Owner[.]"

- "[T]he remaining proceeds will be used to (i) pay down $ million in borrowings under the Blue Racer credit facility and (ii) purchase $ million of Holdco Units (along with a corresponding number of Class B shares, which will be cancelled) from the Existing Owners, with the total number of Holdco Units acquired by us from Holdco and the Existing Owners equaling the number of Class A shares sold by us in the offering."

JX 225 at '436.

## I.     This Litigation

On May 13, 2019, Williams filed this lawsuit, naming as defendants Caiman II, Blue Racer, EnCap, Oaktree, Caiman Management, the EnCap Managers, and the Oaktree Manager. Count I asserted a claim for anticipatory breach of the Caiman LLC Agreement based on the defendants plan to amend the Caiman Purpose Clause and the Blue Racer Purpose Clause without Williams' consent. Count II sought a declaratory judgment that the defendants could not amend the Caiman Purpose Clause or the Blue Racer Purpose Clause without Williams' consent.

On June 13, 2019, the defendants filed counterclaims and asserted affirmative defenses. The sole count in the counterclaims sought the following declaratory judgments:

29

- "Williams is not entitled to dictate the terms of the Qualified IPO (including, among other things, insisting that the [Caiman Purpose Clause] be included in the IPO charter documents and remain in place forever unless Williams consents otherwise)[.]"

- "In connection with the IPO, Williams is limited to the protections set forth in Section 9.5 of the LLC Agreement[.]"

- "Williams is not entitled to consent rights regarding amendments to the charter of the IPO Issuer[.]"

- "Williams is not entitled to unilaterally block the Proposed Amendments under 12.2(a)(v)."

Dkt. 99 at 26–27. The parties agreed to litigate on an expedited basis.

## J.    Post-Litigation Developments

While the litigation was proceeding, the parties continued to negotiate aspects of the Up-C IPO. *See, e.g.*, JX 231; JX 233; JX 236. Williams advised Caiman II that Williams would view "as adverse" any amendments to the Caiman LLC Agreement that would "facilitate an Up-C Structure" or "make the economic waterfall provisions more advantageous to other parties in connection with an Up-C Structure . . . ." JX 244 at 1.

In June 2019, Caiman Management met with financial advisors who were vying to lead the IPO. Barclays recommended an IPO size of approximately $650 million. JX 237 at '709. Wells Fargo recommended an IPO of between $500 million and $750 million. JX 238 at '022.

## II.    LEGAL ANALYSIS

The dispute between the parties reduces to disagreements over their respective rights under the Caiman LLC Agreement. Each side seeks declaratory judgments establishing its

30

preferred interpretations. To the extent that each side seeks further relief, such as the issuance of an injunction, that relief is premised on its interpretations being correct.

The party seeking a declaratory judgment assumes the burden of proving its position. *See San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch.), *aff'd*, 981 A.2d 1173 (Del. 2009). Because both sides have sought declaratory judgments, each theoretically bears the burden of proving its position by a preponderance of the evidence. As a practical matter, the allocation of the burden of proof "becomes relevant only when a judge is rooted on the fence post and thus in equipoise." *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 791–92 (Del. Ch. 2011), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

In this case, the competing burdens of proof are not at issue because this decision interprets the relevant provisions as a matter of law. For purposes of the factual findings set forth in this decision, the evidence was not in equipoise, and the preponderance-of-the-evidence standard would result in the same determinations, regardless of which party bore the burden of proof.

## A.    Principles of Contract Interpretation

To resolve the parties' disagreements requires interpretation of the Caiman LLC Agreement. When interpreting an LLC agreement, "a court applies the same principles that are used when construing and interpreting other contracts." *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018). "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties'

31

intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). The "contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal quotation marks omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374. Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *Id.* at 374 (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alteration in original)). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Sun-Times Media Gp. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202). "[T]he private, subjective feelings" of contract "negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (footnote omitted).

## B.     EnCap's Authority Under Section 6.8(c)

As described in Blue Racer's confidential Form S-1, and as presented at trial, the defendants' proposed Up-C IPO has many steps. As authority for EnCap's ability to implement these steps, the defendants rely in the first instance on Section 6.8(c) of the

33

Caiman LLC Agreement. This section does not provide EnCap with the expansive authority that the defendants' claim.

Sections 6.8(a), (b), and (c) of the Caiman LLC Agreement identify different approvals that Caiman II must obtain before it can engage in identified actions. Section 6.8(a) states:

> In addition to any other matters under Applicable Law or pursuant to the provisions of this Agreement that require the approval of or a determination by the Board . . . ,
>
> [Caiman II] (or the officers and agents acting on its behalf), on its own behalf or on behalf of any of its subsidiaries, shall not take any of the following actions without having first received Majority Board Approval,
>
> unless such matter is a Special Voting Item (in which event the approval set forth in <u>Section 6.8(b)</u> and no other shall be required)
>
> or a Major Special Voting Item (in which event the approval set forth in <u>Section 6.8(c)</u> and no other shall be required),
>
> and unless such actions were previously and expressly approved by the Board in connection with, or as a part of, approving the most recently approved Overhead Budget, Capital Budget, or Operation and Enhancement Plan . . . .

JX 1, § 6.8(a) (formatting altered). Section 6.8(a) then lists the "actions" that Caiman II cannot engage in "without first having received Majority Board Approval." *Id.* The list of twenty-one actions includes item (xvii), which is "to make a distribution by [Caiman II] to the Members." It also includes a catchall item (xxi), which is "to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing." *Id.* § 6.8(a).

The Caiman LLC Agreement defines "Majority Board Approval" as "the approval of those Managers having the Majority of the Voting Power." *Id.* at 10. It defines "Majority

34

of the Voting Power" to mean "those Managers whose aggregate votes equal or exceed, [sic] a majority of the votes then entitled to be exercised by Managers then entitled to be designated to the Board." *Id.* § 6.2(b). Because the Board consists of nine seats, before Caiman II can take any of the twenty-one identified actions, it must receive approval from at least five of the managers serving on the Board.

As indicated by Section 6.8(a), Section 6.8(b) identifies a list of Special Voting Items, which are actions that Caiman II cannot engage in without *both* receiving Majority Board Approval *and* the approval of at least one EnCap Manager and one Williams Manager. In pertinent part, Section 6.8(b) states:

> Notwithstanding Section 6.8(a) . . . [Caiman II] (or the officers and agents acting on its behalf), on its own behalf or on behalf of any of its subsidiaries (and for the purposes of this Section 6.8(b), Blue Racer shall be deemed to be a "subsidiary" of [Caiman II]), shall not take any of the following actions (each a "Special Voting Item") without having first received Majority Board Approval, which majority must include the affirmative vote of at least one EnCap Manager and at least one [Williams Manager] . . . .

*Id.* § 6.8(b). The list of fourteen Special Voting Items includes item (xii), "to amend, modify or otherwise change . . . in any material respect any Blue Racer Agreement . . . ." *Id.* It also includes a catchall item (xiv), which is "to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing." *Id.*

As further indicated by Section 6.8(a), Section 6.8(c) identifies a list of Major Special Voting Items, which are actions that a single EnCap Manager has the sole and exclusive ability to approve. In its entirety, Section 6.8(c) states:

Notwithstanding <u>Section 6.8(a)</u> and <u>Section 6.8(b)</u> the following actions (each a "<u>Major Special Voting Item</u>") shall only require the affirmative vote of one EnCap Manager, and upon such affirmative vote shall be deemed approved as an act of the Board (and, for the avoidance of doubt, such actions may not be taken by any other vote or approval of the Board):

> (i) to approve a Qualified IPO, or

> (ii) to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

*Id.* § 6.8(c). Although this provision empowers "a single EnCap Manager" with this authority, for simplicity, this decision refers to the authority as being vested in EnCap.

The parties agree that Section 6.8(c) applies "[n]otwithstanding Section 6.8(a) and Section 6.8(b)," and they agree that Section 6.8(c)(i) gives EnCap the sole and exclusive authority to approve a Qualified IPO. They disagree about the implications of Section 6.8(c)(ii). The defendants contend that Section 6.8(c)(ii) gives EnCap sole and exclusive authority to take any action with respect to a Qualified IPO. They read the authority "to take any action . . . with respect to . . . the foregoing" as meaning "to take any action with respect to a Qualified IPO." They conclude that if the Caiman LLC Agreement requires or empowers the Board to take action on a particular item, and if Section 6.8(a) or (b) would require a different vote for Board action, then Section 6.8(c) vests EnCap with the sole and exclusive authority to take action on behalf of the Board if a Qualified IPO is involved.

Williams reads Section 6.8(c)(ii) more narrowly. As Williams sees it, the grant of authority in Section 6.8(c)(ii) "to take any action . . . with respect to . . . the foregoing" means "to take any action with respect *the approval of* a Qualified IPO." Williams does

36

not read the resulting authority as extending to any action in connection with a Qualified IPO, only the steps necessary to approve a Qualified IPO.

To bolster its reading, Williams points out that the Caiman LLC Agreement contains the Qualified IPO Section, which contains twelve single-spaced paragraphs identifying actions that the Board can take in connection with a Qualified IPO and the rights that certain members have. *See id.* § 9.5. In particular, Section 9.5(b) states:

> Notwithstanding anything to the contrary in this Agreement, at any time after the approval of a Qualified IPO in accordance with this Agreement, the Board shall be entitled
>
> [1] to approve the transaction or transactions to effect the IPO Exchange and
>
> [2] to take all such other actions as are required or necessary to facilitate the Qualified IPO including
>
>> forming any entities required or necessary in connection with the Qualified IPO without the consent or approval of any other person (including any Member).

*Id.* § 9.5(b) (formatting altered) (enumeration added). This decision refers to subpart [1] as the "IPO Exchange Clause," subpart [2] as the "IPO Facilitation Clause," and subpart [2]'s subsidiary right to form entities as the "Entity Formation Clause."

Williams correctly observes that under the defendants' reading of Section 6.8(c)(ii), the Qualified IPO Section largely becomes surplusage. The IPO Facilitation Clause, for example, empowers EnCap "to take all such . . . actions as are required or necessary to facilitate the Qualified IPO . . . ." *Id.* § 9.5(b). If the defendants were correct that Section 6.8(c)(ii) vested EnCap with the sole and exclusive authority "to take any action . . . with respect to . . . [a Qualified IPO]," then Section 9.5(b) would not serve any purpose, because Section 6.8(c)(ii) already would have covered the waterfront.

37

The defendants' interpretation of Section 6.8(c) is also unreasonable because it has no natural limiting principle. As long as EnCap was acting with respect to a Qualified IPO, the defendants' interpretation would give a single EnCap Manager the ability to take any action whatsoever, notwithstanding any requirement in Section 9.5 or any other section of the Caiman LLC Agreement. For example:

- Section 9.5(a) establishes requirements for proceeding with a Qualified IPO, and Sections 9.5(d) and (e) specify requirements for proceeding with an MLP Conversion. Under the defendants' reading of Section 6.8(c)(ii), EnCap could override those provisions and effectuate a different transaction that failed to comply with those requirements.

- Sections 3.2, 3.7, 3.8 and 9.2 limit the situations under which new members can be admitted to Caiman II. Under the defendants' reading, EnCap could admit new members in connection with a Qualified IPO.

- Section 4.3 precludes the payment of interest on capital contributions and forecloses a member from requiring the return of its capital contribution. Under the defendants' reading, EnCap could recover its capital contribution, with interest, in connection with a Qualified IPO.

- Section 6.3(a) empowers the member that appointed a particular manager to remove the manager. Under the defendants' reading, EnCap could remove a Williams Manager or the Oaktree Manager in connection with a Qualified IPO.

- Sections 6.3(b) and (c) grant protections against removal to Caiman Management in their capacities as members of the Board. Under the defendants' reading, EnCap could override these protections in connection with a Qualified IPO.

- Section 6.4(a) empowers Williams and Oaktree to designate a successor manager to fill any vacancy created by the death, disability, retirement, resignation, or removal of a designated manager. Under the defendants' reading, EnCap could fill these vacancies in connection with a Qualified IPO.

- Section 6.4(b) empowers certain "Management Investors" to fill any vacancy created by the death, disability, retirement, resignation, or removal of a

38

"Management Manager." Under the defendants' reading, EnCap could fill these vacancies in connection with a Qualified IPO.

- Section 6.5(d) requires a quorum for a valid meeting of the Board, and the same quorum requirement exists under Section 6.5(g) for action by written consent. Section 6.8(c) only addresses the voting standard, not the quorum requirement. Under the defendants' reading, EnCap could ignore the quorum requirement for any meeting of the Board, or any action by written consent, in connection with a Qualified IPO.

- Section 6.5(f) entitles Lafield to serve as chairman of any meeting of the Board as long as he is a member and empowers the chairman to determine the order of business and the procedure, including the manner of voting and conduct of discussion. Under the defendants' reading, EnCap could take over meetings of the Board in connection with a Qualified IPO.

- Section 6.6 prohibits managers from receiving compensation for serving on the Board. Under the defendants' reading, EnCap could pay managers for their service in connection with a Qualified IPO.

To be clear, EnCap is not claiming that Section 6.8(c)(ii) gives it these rights. Nevertheless, a necessary implication of EnCap's argument would be that its rights under Section 6.8(c)(ii) would sweep so broadly that they would override these aspects of the Caiman LLC Agreement. *See Sun-Times*, 954 A.2d 400–01 (describing the importance of considering "the practical implications" of a party's interpretive position).

Williams' reading harmonizes Section 6.8(c)(i) with the Qualified IPO Section and gives meaning to both sections. Section 6.8(c)(i) gives EnCap the unilateral authority to approve a Qualified IPO. If EnCap exercises its authority, then the Qualified IPO Section governs what EnCap can do to structure and carry out the IPO.

Williams' reading also gives meaning to Section 6.8(c)(ii), which provides EnCap with unilateral authority to "to take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to [the approval of a Qualified

39

IPO]." Absent this additional authority, the quorum requirements in the Caiman LLC Agreement could interfere with the ability of a single EnCap Manager to act validly at a meeting or by written consent to approve a Qualified IPO, as could the power of the chairman of the Board to control the order of business and procedure at a meeting. *See id.* §§ 6.5(d)–(g).

Finally, Williams' reading explains why Section 9.5(a) takes pains to specify that references in the Qualified IPO Section to the "Board" refer to "the Board with the approval required for a Major Special Voting Item." *Id.* § 9.5(a). Under the defendants' reading of Section 6.8(c)(ii), there would have been no need to include this language because Section 6.8(c)(ii) would have already provided EnCap with sole and exclusive authority "to take any action . . . with respect to . . . [a Qualified IPO]." Without this language, the references to "the Board" in the Qualified IPO Section would indicate that although EnCap could *approve* the Qualified IPO, only the Board as a whole had the authority *to effectuate* the Qualified IPO. The plain language of Section 9.5(a) addresses this problem by providing EnCap with the authority to effectuate a Qualified IPO. The inclusion of this language similarly indicates that Section 6.8(c) only grants EnCap authority with respect to the *approval* of a Qualified IPO, after which EnCap must look to the Qualified IPO Section to determine the scope of its authority to carry it out.

Read in conjunction with other sections in the Caiman LLC Agreement, Section 6.8(c) does not give EnCap expansive authority to take any conceivable action with respect to a Qualified IPO. Section 6.8(c)(i) grants EnCap sole and exclusive authority to approve or reject a Qualified IPO, and Section 6.8(c)(ii) ensures that EnCap has the power to take

40

all actions with respect to the approval of a Qualified IPO, notwithstanding potential procedural impediments in the Caiman LLC Agreement. Once EnCap has approved a Qualified IPO, the Qualified IPO Section determines what steps EnCap can take to effectuate the Qualified IPO.

## C. EnCap's Authority Under The Qualified IPO Section

The defendants separately argue that EnCap has the unilateral power to carry out the multiple steps involved in the Up-C IPO under the Qualified IPO Section. Within the Qualified IPO Section, Section 9.5(b) grants EnCap the authority "to approve the transaction or transactions to effect the IPO Exchange and to take all such other actions as are required or necessary to facilitate the Qualified IPO . . . ." *Id.* § 9.5(b). Within this provision, the IPO Exchange Clause authorizes EnCap "to approve the transaction or transactions to effect the IPO Exchange," and the IPO Facilitation Clause authorizes EnCap "to take all such other actions as are required or necessary to facilitate the Qualified IPO." Providing an example of the latter grant of authority, the Entity Formation Clause authorizes the "forming any entities required or necessary in connection with the Qualified IPO."

### 1. EnCap's Authority Under The IPO Exchange Clause

The defendants contend that in carrying out the Up-C IPO, EnCap can rely on the IPO Exchange Clause. Section 9.5(a) describes the requirements for an "IPO Exchange" as follows:

> [1] In connection with any proposed Qualified IPO approved in accordance with this Agreement, the outstanding Membership Interests will be converted or exchanged in accordance with this Section 9.5 into equity securities of the

41

IPO Issuer ("IPO Securities") of the same class or series as the securities of the IPO Issuer proposed to be offered to the public in the Qualified IPO (the "Publicly Offered Securities").

[2] Each outstanding Membership Interest will be converted into or exchanged for IPO Securities at such time as determined by the Board with the approval required for a Major Special Voting Item in a transaction or series of transactions that give effect to the provisions of Section 5.4 (the "IPO Exchange") such that each holder of Membership Interests will either

(i) receive IPO Securities having a Fair Market Value equal to the same proportion of the aggregate Pre-IPO Value, if any, that such holder would have received if all of [Caiman II's] cash and other property had been distributed by [Caiman II] in complete liquidation pursuant to the rights and preferences set forth in Section 10.2(h) as in effect immediately prior to such distribution assuming that the value of the IPO Issuer immediately prior to such liquidation distribution was equal to the Pre-IPO Value or

(ii) have such Membership Interests cancelled for no consideration, if the application of the foregoing clause (i) would result in a holder of Membership Interests receiving no IPO Securities.

*Id.* § 9.5(a) (formatting altered) (bracketed numbering added). The defendants contend that sentence [2] gives EnCap further (and, in their view redundant) authority to determine the "time" at which "[e]ach outstanding Membership Interest will be converted into or changed for IPO Securities."

The primary purpose achieved by the plain language of Section 9.5(a) is not to empower EnCap, but rather to establish the requirements for carrying out a Qualified IPO. Sentence [1] provides that in connection with any Qualified IPO, "the outstanding Membership Interests" must be exchanged for or converted into equity securities of the IPO Issuer "of the same class or series as the securities of the IPO Issuer proposed to be offered to the public in the Qualified IPO." The Caiman LLC Agreement defines the term "Membership Interests" to mean "the interest of a Member in [Caiman II] . . . ." *Id.* at 11.

42

Sentence [1] thus imposes two requirements for carrying out a Qualified IPO: (i) the membership interests *in Caiman II* must be converted into the securities of the IPO Issuer (the "Caiman Interests Requirement"), and (ii) the securities that the members receive must be "of the same class or series as the securities of the IPO Issuer proposed to be offered to the public" (the "Same Securities Requirement").

Sentence [2] starts with language to make clear that EnCap is empowered to act on behalf of the Board when taking the actions contemplated by the Qualified IPO Section, but the bulk of that provision imposes additional requirements for the IPO Exchange. Under sentence [2], "[e]ach outstanding Membership Interest"—a reiteration of the Caiman Interest Requirement—must be converted into or exchanged for IPO Securities "in a transaction or series of transactions that give effect to the provisions of Section 5.4." Section 5.4 establishes a contractual waterfall for payouts "to the holders of Class A Units, Class B Units, Class C Units, Cass D Units and Class E Units" based on their respective "Sharing Percentages." *Id.* § 5.4. To calculate the amount of IPO Securities that each member is entitled to receive, EnCap must determine "the aggregate Pre-IPO Value, if any, that such holder would have received if all of [Caiman II's] cash and other property had been distributed by [Caiman II] in complete liquidation pursuant to the rights and preferences set forth in <u>Section 10.2(h)</u> . . . ." *See id.* § 9.5(a). The Caiman LLC Agreement defines Pre-IPO Value as

> the product of (a) the quotient obtained by dividing (i) the net proceeds to the IPO Issuer from a Qualified IPO (less the reasonably estimated expenses of such Qualified IPO to the IPO Issuer) by (ii) a fraction (expressed as a percentage), the numerator of which is the number of Publicly Offered Securities to be sold to the public in the Qualified IPO and the denominator

of which is the total number of securities of the same class or series as the Publicly Offered Securities (including the Publicly Offered Securities) that will be outstanding immediately after the Qualified IPO and (b) the difference between 100% and the percentage described in clause (a)(ii) of this definition.

*Id.* at 13. The "rights and preferences set forth in Section 10.2(h)" incorporate the members' contractually defined "Sharing Percentages" from Section 5.4(c) and also take into account their capital account balances. *See id.* §§ 10.2(d), (h).

In substance, these calculations require that EnCap determine how much each Caiman II member would receive under the dissolution waterfall in a hypothetical sale of Caiman II for an amount equal to the anticipated IPO proceeds, and then use the resulting amounts to determine the members' relative ownership stakes in Caiman II. In the IPO Exchange, the membership interests of each member in Caiman II must either be (i) converted or exchanged into IPO Securities "having a Fair Market Value equal to the same proportion of the pre-IPO Value," or (ii) cancelled for no consideration if the member would not receive anything in the distribution (the "Waterfall Distribution Requirement").

The plain language of the IPO Exchange Clause authorizes EnCap "to approve the transaction or transactions to effect the IPO Exchange." *Id.* § 9.5(b). The IPO Exchange, however, must comply with the requirements of Section 9.5(a), including the Caiman Interests Requirement, the Same Securities Requirement, and the Waterfall Distribution Requirement.

In this case, the defendants cannot rely on the IPO Exchange Clause as a source of authority for the Up-C IPO because EnCap is not using its authority "to effect the IPO Exchange" as defined in Section 9.5(a). In the proposed Up-C IPO, the membership

44

interests of Caiman II would not be converted into the same IPO Securities that the public would receive, which would violate both the Caiman Interests Requirement and the Same Securities Requirement. The package of securities that the defendants have proposed to provide to the members of Caiman II appears to satisfy the allocative component of the Waterfall Distribution Requirement, but the defendants' proposal does not contemplate providing that value in the form of IPO Securities, as called for by the Waterfall Distribution Requirement.

The Qualified IPO Section does not recognize any situations in which the Qualified IPO can depart from the Caiman Interests Requirement or the Waterfall Distribution Requirement. The Qualified IPO Section only recognizes one situation in which the parties can depart from the Same Securities Requirement. Section 9.5(d) states that in the event of an MLP Conversion, the securities of the master limited partnership would be valued in accordance with the Waterfall Distribution Requirement "and distributed in two sequential, contemporaneous distributions . . . ." *Id.* § 9.5(d). The first distribution would consist of "any cash, the common units and subordinated units of the master limited partnership," and the second would consist of "any incentive distribution rights or similar incentive securities," recognizing that the distributions made in the first tranche could result in changes in the amounts that holders would receive under the second tranche. *Id.* Here, EnCap is not pursuing an MLP Conversion.

Demonstrating that the Up-C IPO will not comply with the Caiman Interests Requirement, the Same Securities Requirement, or the Waterfall Distribution Requirement, EnCap proposes to amend Section 9.5(a) so that it authorizes the type of transaction that

45

EnCap wants to implement through the Up-C IPO. The defendants claim that EnCap can make those amendments, and then invoke the IPO Exchange Clause to carry out the IPO Exchange once EnCap has rewritten that clause. As discussed below, EnCap does not have the power to amend the Caiman LLC Agreement in pursuit of a Qualified IPO. *See infra*, Part II.D.2. EnCap can exercise the authority it possesses under the Caiman LLC Agreement to approve and effectuate a Qualified IPO, but EnCap does not have the power to change what constitutes a Qualified IPO or its component parts and thereby grant itself different and greater rights.

In sum, the IPO Exchange Clause is not a meaningful source of authority for EnCap in pursuing the Up-C IPO. The IPO Exchange Clause authorizes EnCap to implement the IPO Exchange, but the contractual parameters of the IPO Exchange impose limitations on what EnCap can accomplish. The IPO Exchange Clause restricts what EnCap can do; it does not expand what EnCap can do.

### 2.    EnCap's Authority Under The IPO Facilitation Clause

To support their position that EnCap can effectuate the proposed Up-C IPO, the defendants rely most heavily on the IPO Facilitation Clause. To reiterate, that clause states:

> Notwithstanding anything to the contrary in this Agreement, at any time after the approval of a Qualified IPO in accordance with this Agreement, [EnCap] shall be entitled . . . to take all such other actions as are required or necessary to facilitate the Qualified IPO . . . without the consent or approval of any other person (including any Member).

JX 1, § 9.5(b).

Under the plain language of the IPO Facilitation Clause, EnCap is entitled to take all such actions as are "required or necessary to facilitate the Qualified IPO." "Something

46

required is necessary or essential, and a requirement is something that must take place." *CompoSecure, L.L.C. v. CardUX, LLC*, 2019 WL 2371954, at *2 (Del. Ch. June 5, 2019), *aff'd*, --- A.3d ---, 2019 WL 3311949 (Del. July 24, 2019). The term "necessary" is thus a synonym for "required." Its inclusion is an example of "the law's hoary tradition of deploying joint terms, such as 'indemnify and hold harmless,' where technically one term would suffice." *See Quadrant Structured Prods. Co. v. Vertin*, 106 A.3d 992, 1024 (Del. 2014).[10] The word "facilitate" means "to make easier" or "help bring about."[11]

Here, the object of facilitation is a "Qualified IPO." The Caiman LLC Agreement defines that term as

> any [1] underwritten initial public offering by the IPO Issuer of equity securities

---

[10] *See, e.g.*, *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) (declining to give separate meaning to the phrase "hold harmless"; noting that "[t]he terms 'indemnify' and 'hold harmless' have a long history of joint use throughout the lexicon of Anglo-American legal practice"); *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 788 (Del. Ch. 2016) (discussing functional equivalence of the terms "necessary" and "essential"), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, --- A.3d ---, 2019 WL 3683525 (Del. Aug. 7, 2019); *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1194 n.2 (Del. Ch. 2011) (same). *See generally* Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 11.2 at 192 (2d ed. 2006) ("The doublet and triplet phrasing common in Middle English still survives in legal writing, especially contracts, wills, and trusts. That's probably the worst possible soil for it to grow in because those who interpret legal writing are impelled to strain for distinctions so that no word is rendered surplusage. Yet that is exactly [what] all but one word . . . is [in these phrases].").

[11] *See, e.g.*, *Facilitate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/facilitate (last visited Sept. 20, 2019) ("**:** to make easier **:** help bring about"); *see also Facilitate*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("To make the occurrence of (something) easier; to render less difficult."); *Facilitate*, Bryan A. Garner, A DICTIONARY OF MODERN ENGLISH USAGE 373 (4th ed. 2016) ("to aid, help, ease").

[2] pursuant to an effective registration statement under the Securities Act

[3] for which aggregate cash proceeds to be received by the IPO Issuer from such offering (without deducting underwriting discounts, expenses and commissions) are at least $75,000,000;

[4] provided that a Qualified IPO shall not include an offering made in connection with a business acquisition or combination pursuant to a registration statement on Form S-4 or any similar form, or an employee benefit plan pursuant to a registration statement on Form S-8 or any similar form.

JX 1 at 14 (formatting altered) (enumeration added).

Under the plain meaning of the IPO Facilitation Clause, EnCap is entitled to take actions that are "necessary or required to facilitate a Qualified IPO." In other words, EnCap is entitled to take actions that are necessary or required to facilitate an IPO having the characteristics of a Qualified IPO as described in the Caiman LLC Agreement. Most obviously, EnCap can hire an underwriter, retain securities counsel, and take other actions required or necessary to facilitate an unwritten offering of equity securities pursuant to an effective registration statement, such as conducting due diligence and making filings with the SEC. More broadly, EnCap is empowered to take actions required or necessary to facilitate an offering that raises cash proceeds of at least $75 million, which is the amount targeted in the definition of a Qualified IPO. EnCap is not empowered to take actions to facilitate an IPO that would raise less than $75 million.

A more difficult question is whether the IPO Facilitation Provision gives EnCap the power to disregard otherwise mandatory provisions of the Caiman LLC Agreement, such as the Caiman Interest Requirement, the Same Securities Requirement, and the Waterfall Distribution Requirement. This question can be answered by recognizing that when EnCap

48

takes action under the IPO Facilitation Provision, EnCap is acting on behalf of the Board. That provision therefore only gives EnCap the power to take action that the Board otherwise would have authority to take. Put differently, EnCap cannot take actions that the Caiman LLC Agreement does not empower the Board to take.[12] For similar reasons, EnCap cannot take actions that the Caiman LLC Agreement has empowered specific members to take, such as designating or removing particular managers. *See* Part II.B, *supra* (listing examples of mandatory provisions and members' rights).

The fact that EnCap is acting on behalf of the Board also means that the IPO Facilitation Provision does not empower EnCap to act unilaterally to amend the terms of the Caiman LLC Agreement. The scope of the Board's authority over various matters and the votes required for the Board to take valid action are set forth in Sections 6.8(a), (b), and (c). Under Section 6.8(e), the Board's exercise of authority under Sections 6.8(a), (b), and

---

[12] This reading results from the distinction between (i) action that the entity either cannot take or must take under its governing statute or constitutive documents, and (ii) the discretionary authority of the appropriate decision-maker to cause the entity to take or not to take action that falls within the entity's powers. In traditional corporate parlance, the former deals with the issue of whether the corporation has the capacity to take a particular action; the latter deals with the question of the approvals necessary for the action to be validly taken. *See Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing historical distinction between "capacity and power" and ability of particular constituencies, including the board, to exercise "capacity or power" on behalf of the corporation), *abrogated on other grounds by El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* §§ 11.01, 11.05 (2018) (same); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* §§ 2.1, 2.3 (3d ed. Supp. 2019-2) (same); *see also* Model Bus. Corp. Act. §§ 3.02, 3.04 (2016) (discussing parallel distinction under MBCA).

(c) is subject to Section 12.2, which governs amendments to the Caiman LLC Agreement. The Board cannot amend the Caiman LLC Agreement by invoking its authority under Section 6.8(a), (b), or (c); the Board must comply with the requirements of Section 12.2.

By the same token, EnCap does not have the power under the IPO Facilitation Provision to amend the Caiman LLC Agreement. The IPO Facilitation Clause gives EnCap the power to carry out a Qualified IPO that the Board (through EnCap) has approved under Section 6.8(c). The fact that the Board (through EnCap) cannot amend the Caiman LLC Agreement under Section 6.8(c) when approving the Qualified IPO means that EnCap cannot amend the Caiman LLC Agreement when effectuating the Qualified IPO. Otherwise, EnCap would be able to approve a Qualified IPO, and then use the ensuing authority to amend the very sections that specify what a Qualified IPO means and entails, such as the definition of a Qualified IPO and the parameters for the IPO Exchange.

The defendants argue that because the IPO Facilitation Clause begins with the phrase "[n]otwithstanding anything to the contrary in this Agreement," EnCap can ignore mandatory provisions in the Caiman LLC Agreement and act unilaterally to amend those provisions. Although that reading might be plausible when the IPO Facilitation Clause is read in isolation, it does not take into account the Caiman LLC Agreement as a whole, which contemplates EnCap effectuating a Qualified IPO that has been approved under Section 6.8(c) and is carried out in compliance with the Qualified IPO Section. The limitations in Section 6.8(e) and EnCap's role in exercising the Board's authority for purposes of the Qualified IPO Section mean that EnCap can take action that the Board otherwise could take, but cannot disregard mandatory requirements or amend them such

that they are no longer meaningful. The IPO Facilitation Clause empowers EnCap to make all discretionary decisions "[n]otwithstanding anything to the contrary in this Agreement." It does not empower EnCap to override or amend the Caiman LLC Agreement.

**D.**     **The Application Of The Provisions To Six Disputed Steps In The Up-C IPO**

Having construed the plain meaning of the various provisions in the Caiman LLC Agreement, the next task is to apply those provisions to six disputed steps in the proposed Up-C IPO. Williams contends that EnCap lacks the authority to implement the disputed steps.

Before the Up-C IPO, in simplified form, the ownership structure for Caiman II and Blue Racer can be depicted as follows:



This diagram does not reflect the fact that Caiman II holds its 50% interest in Blue Racer through Ohio Midstream.

After the Up-C IPO that EnCap intends to carry out, the same business will have the following ownership structure:



To get from point A to point B, EnCap will take numerous actions, which can be grouped together in varying combinations. Williams has disputes EnCap's ability to implement six of the steps:

- Disputed Step One: Form PubCo and HoldCo.

- Disputed Step Two: Amend the Caiman LLC Agreement.

- Disputed Step Three: Amend the Blue Racer LLC Agreement.

- Disputed Step Four: Distribute the Blue Racer units held by Caiman II to Caiman II's members.

- Disputed Step Five: Form a subsidiary of HoldCo, merge it into Blue Racer, and convert the Blue Racer units into HoldCo units and Class B shares of PubCo.

- Disputed Step Six: Form a subsidiary of Blue Racer and merge it with Caiman II.

52

### 1. Disputed Step One: Form PubCo And HoldCo.

EnCap has already completed the first disputed step in the Up-C IPO, which involved creating the entities that it regards as necessary to facilitate the Up-C IPO. EnCap did not include provisions analogous to the Purpose Clauses in the governing documents of those entities. Williams claims that EnCap could not form entities that lacked analogous provisions, but under the IPO Facilitation Clause and the Entity Formation Clause, EnCap had the authority to omit those provisions from the new entities' governing documents.

On April 24, 2019, EnCap formed PubCo, the Delaware corporation that EnCap intends to use as the IPO Issuer. EnCap also formed HoldCo, the Delaware limited liability company that will serve as a pivotal intermediate entity in the post-Up-C IPO structure. If the Up-C IPO is completed, then PubCo's only material asset will be membership interests in HoldCo, and HoldCo will own 100% of Blue Racer. JX 184 at '729.

To effectuate the Up-C IPO, PubCo will issue two classes of shares. Class A shares will have one vote per share and carry economic rights, including the right to dividends. Class B shares will also have one vote, but will not have any economic rights. Public investors will purchase Class A shares in the Up-C IPO. Legacy members of Caiman II will receive Class B shares and member interests in HoldCo as a result of a merger between an acquisition subsidiary of HoldCo and Blue Racer. Each Class B share will be paired on a one-for-one basis with a member interest in HoldCo, with the latter carrying the economic rights that the former lacks. *See id.* at '716–17.

As noted, the governing documents of PubCo and HoldCo do not contain provisions analogous to the Purpose Clauses. The defendants seek a declaration that EnCap has the

53

authority under the Entity Formation Clause to form entities to effectuate the Qualified IPO whose governing documents do not contain provisions analogous to the Purpose Clauses. At times, Williams does not seem to contend otherwise, arguing only that other steps in the Up-C IPO require Williams' consent, and that "Williams will not consent to these steps" unless PubCo's certificate of incorporation contains a clause analogous to the Purpose Clauses. Dkt. 159 at 5. At other times, Williams appears to contend that PubCo's certificate of incorporation must contain such a clause.

The IPO Facilitation Clause gives EnCap the power to form entities that are required or necessary to facilitate the Qualified IPO. The Entity Formation Clause expressly grants that power by providing that the authority conferred by the IPO Facilitation Clause "includ[es] forming any entities required or necessary in connection with the Qualified IPO." JX 1, § 9.5(b). Nothing in the IPO Facilitation Clause or the Entity Formation Clause establishes any requirements for the contents of the governing documents of the entities that EnCap forms.

Although the Caiman LLC Agreement contemplates that either Caiman II or Blue Racer could serve as the IPO Issuer, in which case the IPO Issuer's governing documents would contain a Purpose Clause, the IPO Issuer can be another entity that is an "Affiliate" of Caiman II. The Caiman LLC Agreement defines an "Affiliate" as "any person directly or indirectly Controlling, Controlled By, or Under Common Control with such person." *Id.* at 3. The Caiman LLC Agreement defines "Controlling, Controlled By, or Under Common Control" as "the possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any

54

partnership or other ownership interest, by contract or otherwise) of a person." *Id.* at 6. The Caiman LLC Agreement thus recognizes that the IPO Issuer could be any entity that controls, is controlled by, or is under common control with Caiman II. When the definition of "Affiliate" is read together with the Entity Formation Clause, the IPO Issuer could be a newly formed entity that controls, is controlled by, or is under common control with Caiman II. There is nothing in the Caiman LLC Agreement that requires the governing documents of the Affiliate to have a provision analogous to the Purpose Clauses.

Williams argues that because the IPO Issuer must be either Caiman II or an Affiliate of Caiman II, the governing documents of the IPO Issuer must contain a Purpose Clause. In support of this argument, Williams cites Section 12.8 of the Caiman LLC Agreement, which states that "[w]here any provision of this Agreement refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such person, including actions taken by or on behalf of any Affiliate of such person." This provision does not say that the governing document of an Affiliate must contain a Purpose Clause. It rather implies the opposite by saying that if Caiman II is required to act or prohibited from acting under the Caiman LLC Agreement, then Caiman II cannot achieve the same result by acting through an Affiliate. This suggests that the Affiliate is not under the same restriction because if it were, it already would be unable to take the specified action, and Section 12.8 would not add anything.

EnCap thus had the authority under the IPO Facilitation Clause and the Entity Formation Clause to form PubCo to serve as the IPO Issuer without including a Purpose

Clause in its certificate of incorporation. That does not mean that the formation of PubCo is without difficulties. The IPO Facilitation Clause and the Entity Formation Clause authorize EnCap to take actions required or necessary to facilitate a Qualified IPO, and as discussed in later sections, the Up-C IPO does not meet the requirements for a Qualified IPO because it does not comply with the Caiman Interests Requirement or the Same Securities Requirement. Because of these problems, the defendants failed to prove that forming PubCo was required or necessary to facilitate a Qualified IPO. But the defendants did prove that EnCap had the authority not to include a Purpose Clause in PubCo's certificate of incorporation.

The same is true for HoldCo. That entity's role in the Up-C structure depends on the viability of PubCo issuing two different classes of stock and the legacy members of Caiman II initially owning different securities than the public holders will receive. Because these features do not conform to the requirements for a Qualified IPO, the defendants failed to prove that forming HoldCo was required or necessary to facilitate a Qualified IPO. But the defendants did prove EnCap had the authority not to include a Purpose Clause in HoldCo's limited liability company agreement.

### 2. Disputed Step Two: Amend The Caiman LLC Agreement.

Williams next disputes EnCap ability to amend and restate the Caiman LLC Agreement. Williams is correct that EnCap lacks the authority to effectuate these amendments unilaterally.

EnCap proposes to make extensive changes to the Caiman LLC Agreement to enable the Up-C IPO to take place. The changes include, but are not limited to:

56

- Altering the definition of "Available Cash" to include cash generated "with respect to any operations of [Caiman II] other than those conducted by Blue Racer . . . ." JX 232 at '896.

- Altering the definition of "Qualified IPO" so that proceeds generated in secondary public offerings can be credited against the $75 million threshold. *Id.* at '908.

- Adding new defined terms including "Blue Racer Members," "BRM Additional Capital Contribution," "Class A Common Stock," "Class B Common Stock," "Company Level Taxes," "Company Representative," "Covered Audit Adjustment," "Holdco," "Holdco Units," "Incentive Award," "IPO Value," "LTIP," "Partnership Tax Audit Rules," "Secondary Public Offering," "Up-C," "Allocated Securities," "Approved BRM Expenditure," "Excess Tax Amount," "Existing Agreement," "Final Launch Notice," "Final Participation Notice," "Participation Notice," "Preliminary Launch Notice," "Preliminary Participation Notice," "Retained Available Cash," "Tax Contribution Obligation," and "Tax Offset." *See id.* at '895 to '912.

- Deleting the term "Pre-IPO Value." *Id.* at '907.

- Altering the provisions of Section 5.1, which govern Capital Account Allocations. *See id.* at '918 to '921.

- Altering the provisions of Section 5.4, which specifies the waterfall for distributions to unitholders, to treat Incentive Awards under the newly defined LTIP as advances of distributions to holders of Class D Units. *See id.* at '922 to '923.

- Altering the provisions of Section 5.4(c) and introducing a new Section 5.4(d) to alter the requirement to distribute Available Cash and provide for the automatic retention of cash under particular circumstances. *See id.* at '923 to '924.

- Altering the provisions governing payment of distributions (Section 5.5) and tax distributions (Section 5.6). *See id.* at '924 to '927.

- Adding two new items requiring Majority Board Approval: the determination of the amount of Available Cash to be distributed (Section 6.8(a)(xvii)) and the determination of the amount of Available Cash to be reinvested (Section 6.8(a)(xxi)). *See id.* at '934 to '935.

- Altering a Special Voting Item addressing a limitation on funding for Blue Racer (Section 6.8(b)(ii)). *See id.* at '935 to '936.

- Amending the Qualified IPO Section to eliminate the Same Securities Requirement in Section 9.5(a) and add language to authorize the Up-C IPO. *Id.* at '952 to '953.

57

- Amending the Qualified IPO Section to provide that if EnCap determines to engage in an Up-C IPO and pursue an exchange in the manner EnCap contemplates, then "each holder of Units agrees to participate in such an exchange." *Id.* at '953.

- Amending the Qualified IPO Section to add an entirely new subsection with five lengthy subparts addressing the ability of members to participate in a secondary public offering. *Id.* at '954 to '955.

The only contractual basis for EnCap to effectuate these amendments unilaterally is through the IPO Facilitation Clause. For the reasons discussed previously, EnCap's power under that provision, like its approval power under Section 6.8(c), is subject to Section 12.2, which governs amendments to the Caiman LLC Agreement. Assuming for the sake of argument that the defendants could satisfy the general requirements to amend the Caiman LLC Agreement, they still must confront Section 12.2(a)(v), which provides that the terms of the Caiman LLC Agreement "may not be amended in a way that adversely affects the rights or obligations of [Williams] without the approval of [Williams]." JX 1, § 12.2(a)(v).

The extensive changes that EnCap intends to make to the Caiman LLC Agreement are adverse to Williams. Without those changes, EnCap cannot implement the Up-C IPO because the structure of the Up-C IPO would contravene mandatory provisions in the Caiman LLC Agreement, such as the Caiman Interest Requirement, the Same Securities Requirement, and the Waterfall Distribution Requirement. As a result, without the amendments, EnCap cannot force Williams out of the current Caiman II structure and into the post-Up-C IPO structure. At present, Williams is a majority investor in a privately held entity that operates within a governance arrangement that provides Williams with significant rights and protections. Through the Up-C IPO, EnCap wishes to transform

58

Williams into a holder of two different securities: (i) units in a newly formed, privately held entity, plus (ii) Class B common stock in a publicly traded entity. In those new entities, Williams would be a minority investor without significant governance rights. The amendments would also alter the distribution waterfall under Section 5.4 of the Caiman LLC Agreement, which would change Williams' financial rights. By amending the Caiman LLC Agreement, EnCap would make the Up-C IPO possible. By doing so, EnCap would radically alter Williams' position, thereby affecting Williams adversely.

To argue that the amendments are not adverse, the defendants compare Williams' position under the Up-C IPO with Williams' position under a non-Up-C IPO. They claim, but have not established, that there would be no difference between the two for Williams except that the Up-C IPO would carry tax advantages. Even assuming that the defendants had proven that this was the only difference, it is still the wrong comparison. Section 12.2(a)(v) calls for comparing the situation Williams currently enjoys with its situation under the proposed amendments. *See id.* § 12.2(a)(v) (requiring Williams' approval for "amendments to *this Agreement*" that adversely affect Williams' rights and obligations) (emphasis added)). Section 12.2(a)(v) does not call for comparing Williams' situation under one set of amendments with Williams' situation under another set of amendments. Compared to the situation that Williams currently enjoys under the Caiman LLC Agreement, the amendments are adverse.

The defendants also argue that if the amendments are viewed in isolation, nothing about them is adverse to Williams. According to the defendants, any adversity results from the follow-on Up-C IPO rather than from the amendments themselves. The defendants'

59

overly simplified approach ignores the fact that the amendments are designed to authorize and clear the path for the Up-C IPO, a transaction that adversely affects Williams. Without the amendments, EnCap lacks the ability to implement the Up-C IPO. With the amendments, EnCap has the ability to implement the Up-C IPO. The amendments load the gun, which adversely affects the target of the gun. They adversely affect Williams by eliminating the provisions that foreclose the Up-C IPO and exposing Williams to the threat of the Up-C IPO.

Regardless, the amendments are sufficiently intertwined with the other steps in the Up-C IPO that they must be analyzed together for purposes of assessing adversity. "The [step transaction] doctrine treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps are viewed together as components of an overall plan." *Noddings Inv. Gp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568, at *6 (Del. Ch. Mar. 24, 1999) (alteration in original) (quoting *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994)). "The purpose of the step transaction doctrine is to ensure the fulfillment of parties' expectations notwithstanding the technical formalities with which a transaction is accomplished." *Coughlan v. NXP B.V.*, 2011 WL 5299491, at *7 (Del. Ch. Nov. 4, 2011).

The step-transaction doctrine applies if the component transactions meet one of three tests. *See id.* First, under the "end result test," the doctrine will be invoked "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." *Noddings*, 1999 WL

60

182568, at *6 (internal quotation marks omitted). Second, under the "interdependence test," transactions will be treated as one if "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *Id.* (internal quotation marks omitted). The third and "most restrictive alternative is the binding-commitment test under which a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps." *Id.* (internal quotation omitted).

The end result test and the interdependence test are both met here. EnCap designed the amendments to clear the path for the intricate steps necessary to effectuate the Up-C IPO, intending to achieve the end result contemplated of the post-Up-C IPO structure. But for the Up-C IPO, EnCap would have had no reason to propose the amendments and no basis on which to claim the power to implement them. Although EnCap has not bound itself contractually to carry out the Up-C IPO, a series of transactions need only meet one of the three tests to be treated as a single transaction. The satisfaction of the first two tests provides a sufficient basis to treat the amendments to the Caiman LLC Agreement as an integral part of the Up-C IPO for purposes of determining whether they are adverse to Williams. They are, and so they cannot be implemented without Williams' consent.

The nature of the amendments that EnCap seeks to implement further underscores how incongruous it would be to permit EnCap to rely on the IPO Facilitation Provision to implement them. The IPO Facilitation Provision authorizes EnCap to take action required or necessary to facilitate a Qualified IPO. Yet as part of that authority, EnCap claims the

61

ability to amend the definition of a Qualified IPO such that EnCap can use that authority to implement a different type of transaction.

In this case, EnCap might claim that it is making a relatively minor change to the definition of Qualified IPO by aggregating the primary and secondary offerings to determine whether the threshold of $75 million is met. The effect of that change, however, is not minor, as it would enable EnCap to invoke its authority to implement a Qualified IPO, but to then redefine "Qualified IPO" to refer to a different type of transaction. Nor is the change in this case actually minor. Under the original definition of "Qualified IPO," the IPO Issuer is entitled to receive proceeds of at least $75 million. The amendment would enable EnCap to sell its own shares as part of the Qualified IPO, in effect allowing EnCap to divert the proceeds of that sale to itself and yet credit those same proceeds against the $75 million requirement. The IPO Facilitation Clause authorizes EnCap to facilitate a Qualified IPO. It does not authorize EnCap to redefine Qualified IPO to refer to a different transaction and then implement that different transaction.

Absent Williams' consent, EnCap lacks the authority to amend the Caiman LLC Agreement in the manner contemplated for purposes of the Up-C IPO. EnCap therefore cannot carry out what this decision has described as step two of that transaction.

### 3.     Disputed Step Three: Amend The Blue Racer LLC Agreement.

In the third disputed step of the Up-C IPO, EnCap intends to amend and restate the Blue Racer LLC Agreement. In connection with a Qualified IPO, EnCap can act unilaterally on behalf of Caiman II to amend the Blue Racer LLC Agreement. But because

the defendants have not shown that the Up-C IPO is a Qualified IPO, they have not established that EnCap could properly exercise this power.

Under the IPO Facilitation Provision, EnCap has the power to take actions that the Board could take to the extent that those actions are required or necessary to facilitate a Qualified IPO. Section 6.8(b)(xii) gives the Board the power to amend the Blue Racer LLC Agreement with the vote required for a Special Voting Item. In connection with a Qualified IPO, EnCap can take action that the Board otherwise could take.

Although EnCap has the authority to amend the Blue Racer LLC Agreement in connection with a Qualified IPO, EnCap has failed to show that the Up-C IPO is a Qualified IPO. Instead, Williams has shown that the Up-C IPO depends on amendments to the Caiman LLC Agreement that EnCap lacks the power to make. Accordingly, in the context of the Up-C IPO, EnCap lacks authority to amend the Blue Racer LLC Agreement.

### 4. Disputed Step Four: Distribute The Blue Racer Units To Caiman II's Members.

In the fourth disputed step of the Up-C IPO, EnCap intends to cause Caiman II to distribute all of its Blue Racer units to Caiman II's members. Under the IPO Facilitation Clause, EnCap possesses the power to take this step if it is required or necessary to facilitate a Qualified IPO. But because the defendants have not shown that the Up-C IPO is a Qualified IPO, they have not established that EnCap could properly exercise this power.

If EnCap could properly amend the Blue Racer LLC Agreement to create a single class of units, then EnCap could effectuate a distribution of Caiman II's Blue Racer units in connection with a Qualified IPO. Section 6.8(a)(xvii) of the Caiman LLC Agreement

63

gives the Board the authority "to make a distribution by [Caiman II] to [its] Members" with a majority vote of the Board. To the extent that the distribution was necessary or required to facilitate a Qualified IPO, EnCap would have the power under the IPO Facilitation Clause to exercise that authority.

Williams argues that because the distribution would involve Caiman II's entire ownership interest in its only operating asset, it amounts to an Exit Event over which Williams would have a veto. To reiterate, an Exit Event is defined as

> the sale of [Caiman II], in one transaction or a series of related transactions, whether structured as
>
> (i) a sale or other transfer of all or substantially all of the Equity Securities (including by way of merger, consolidation, share exchange, or similar transaction),
>
> (ii) the sale or other transfer of all or substantially all of the assets of [Caiman II] promptly followed by a dissolution and liquidation of [Caiman II],
>
> (iii) any other dissolution or liquidation of [Caiman II], or
>
> (iv) a combination of any of the foregoing.

JX 1 at 8 (formatting altered). Williams reasons that by distributing the Blue Racer units, Caiman II would be transferring substantially all of its assets to its members, resulting in Caiman II's members, rather than Caiman II itself, directly owning Blue Racer.

Under Section 6.8(b)(xi), the Board can approve an Exit Event with the vote required for a Special Voting Item. Characterizing the distribution as an Exit Event thus changes the vote required for the Board to approve it outside of the context of a Qualified IPO. Within the context of a Qualified IPO, EnCap would have the power to exercise the

Board's authority as long as the distribution was necessary or required to facilitate a Qualified IPO.

EnCap alternatively relies on the IPO Exchange Clause to provide it with the authority to distribute Caiman II's entire ownership interest in Blue Racer. The IPO Exchange Clause contemplates that the members' interests in Caiman II will be exchanged for or converted into equity of the IPO Issuer. Under the Same Security Requirement, the members must receive the same type of equity that the IPO Issuer's public investors receive. Although EnCap can achieve this outcome through one more or transactions, the distribution of Caiman II's entire ownership interest in Blue Racer is not a step toward that end. After the distribution, the members of Caiman II would continue to hold their membership interests in Caiman II, and they also would hold membership interests in Blue Racer. Each type of interests would be converted subsequently into a different security, neither of which would be the same security that the IPO Issuer's public investors would receive. EnCap is thus not relying on the requirements of the IPO Exchange Clause as written; EnCap is relying on the amended requirements that it has sought to effectuate. Because this decision has held that EnCap cannot effectuate those amendments, those amendments cannot provide EnCap with the authority to cause Caiman II to distribute its entire ownership interest in Blue Racer.

Consequently, although EnCap has the authority to make the distribution in connection with a Qualified IPO, EnCap has failed to show that the Up-C IPO is a Qualified IPO that would give it the power to take this step. In the context of the Up-C IPO, EnCap

lacks the authority to cause Caiman II to distribute its entire ownership interest in Blue Racer to its members.

### 5. Disputed Step Five: Form An Acquisition Subsidiary Of HoldCo And Merge It With Blue Racer.

In the fifth disputed step of the Up-C IPO, EnCap intends to form an acquisition subsidiary of HoldCo and merge it with and into Blue Racer. As a result of the merger, the membership interests in Blue Racer will be converted into a combination of HoldCo units and Class B shares of PubCo. EnCap lacks the authority to effectuate this step of the Up-C IPO.

Under the Blue Racer LLC Agreement, the act of "commencing, initiating or participating in any amalgamation, merger, or consolidation of [Blue Racer], or any reconstruction, conversion, liquidation, dissolution, bankruptcy or similar proceedings," requires the "prior approval of Members who in the aggregate hold one hundred percent (100%)" of its member interests. JX 34, § 7.11(b)(iv). At this point in the Up-C IPO, the member interests in Blue Racer would have been distributed to the current members of Caiman II, all of whom would have to vote in favor of the merger for it to be approved. Under the terms of the Blue Racer LLC Agreement, EnCap cannot accomplish this step unilaterally.

EnCap contends that the IPO Facilitation Clause gives it the power to take this step because the Up-C IPO must be viewed as a unitary transaction. As discussed previously, the Up-C IPO is correctly viewed as a unitary transaction for certain purposes, such as

when determining whether it has an adverse effect on Williams. That fact does not relieve EnCap of its obligation to establish that it can validly carry out each step of the Up-C IPO.

The IPO Facilitation Clause gives EnCap the authority to exercise power on behalf of Caiman II that the Board otherwise could exercise. As long as Caiman II owned units in Blue Racer and had corresponding rights under the Blue Racer LLC Agreement, EnCap (rather than the Board) could cause Caiman II to exercise those rights to the extent required or necessary to facilitate a Qualified IPO. The IPO Facilitation Clause does not give EnCap the authority to exercise rights or powers that the Board could not exercise.

Under the structure of the Up-C IPO that EnCap has proposed, at the point when it would become necessary to approve the merger of the HoldCo merger subsidiary with and into Blue Racer, Caiman II would no longer own Blue Racer units and would be unable to vote those units in favor of the merger. At that point, Blue Racer would be a separate entity under common ownership with Caiman II, rather than an entity partially owned by Caiman II. Under the structure of the Up-C IPO that EnCap has proposed, EnCap would lack the ability to approve the merger without the unanimous consent of the other members of Blue Racer, including Williams.

### 6. Disputed Step Six: Form An Acquisition Subsidiary Of Blue Racer And Merge It With Caiman II

In the last disputed step of the Up-C IPO, EnCap intends to form an acquisition subsidiary of Blue Racer and merge it with and into Caiman II. The Up-C IPO cannot reach this stage because of earlier problems. Assuming it did, then under the IPO Facilitation Clause, EnCap would possess the power cause Caiman II to merge if it was required or

67

necessary to facilitate a Qualified IPO. In connection with the Up-C IPO, however, EnCap has not made the showing necessary to exercise this authority.

Under the IPO Facilitation Provision, EnCap has the power to take actions that the Board could take to the extent that those actions are required or necessary to facilitate a Qualified IPO. Section 6.8(b)(iii) gave the Board the power "to merge, combine, or consolidate [Caiman II] with any other entity" with the vote required for a Special Voting Item. JX 1, § 6.8(b)(iii). If required or necessary to facilitate a Qualified IPO, then EnCap can take the action that the Board otherwise could take, including merging Caiman II with another entity.

Although EnCap would have the authority to cause Caiman II to merge if required or necessary to facilitate a Qualified IPO, EnCap has failed to show that the Up-C IPO is a Qualified IPO that would give it the power to take this step. Instead, Williams has shown that the Up-C IPO depends on steps that EnCap lacks the power to take. Accordingly, in the context of the Up-C IPO, EnCap does not have authority to cause Caiman II to merge with the Blue Racer acquisition subsidiary.

## E.    The Post-IPO Application Of Section 12.8

Williams argues that because Caiman II will survive the Qualified IPO, albeit as the lowest-tier subsidiary in the entity stack, the Caiman Purpose Clause will continue to bind PubCo, HoldCo, and Blue Racer under Section 12.8 of the Caiman LLC Agreement because they will be Affiliates of Caiman II.

To reiterate, Section 12.8 states: "Where any provision of this Agreement refers to action to be taken by any person, or which such person is prohibited from taking, such

68

provision shall be applicable whether such action is taken directly or indirectly by such person, including actions taken by or on behalf of any Affiliate of such person." *Id.* § 12.8. This provision seems most clearly applicable to a parent entity that acts through a subsidiary, or a sibling entity that acts on behalf of another sibling entity when both entities are wholly owned by the same parent. It seems unlikely that a lower-tier, wholly owned subsidiary would be acting indirectly through a higher-tier entity, as opposed to the other way around, but it would be premature to rule out a possible factual scenario in which that might occur. Whether Caiman II could be found to be acting "indirectly" through PubCo, HoldCo, Blue Racer, or any other Affiliate would be a fact-dependent question that cannot be answered on the current record.

The defendants have argued that because Williams will no longer own any membership interest in Caiman II after the Up-C IPO, it will not have standing to assert a claim under Section 12.8. It is premature to address questions of Williams' standing, which could involve a multi-level derivative action or the novel question of a Williams Manager seeking to sue derivatively.

## F.    The IPO Cooperation Clause

The defendants contend that even if there are steps in the Up-C IPO that require Williams' consent, Williams is required to consent under the second sentence of Section 9.5(b). That provision states that if EnCap approves a Qualified IPO, then each of Caiman II's members shall:

> (i) take such actions as may be reasonably requested by [EnCap] in connection with consummating the IPO Exchange, including

(x) such actions as are required to transfer all of the issued and outstanding Membership Interests or the assets of [Caiman II] to an IPO Issuer or its general partner (including a Blocker Corporation) and

(y) such actions as are required in order to merge or consolidate [Caiman II] into or with an IPO Issuer or its general partner and

(ii) use commercially reasonable efforts to

(x) cooperate with the other Members so that the IPO Exchange is undertaken in a tax-efficient manner and

(y) if any Institutional Investor or its limited partners or investors has a structure involving ownership of all or a portion of its interests in [Caiman II], directly or indirectly, through one or more Blocker Corporations, at the request of such Institutional Investor, merge its Blocker Corporation into the IPO Issuer in a tax-free reorganization, utilize such Blocker Corporation as the IPO Issuer or otherwise structure the transaction so that the Blocker Corporation is not subject to a level of corporate tax on the Qualified IPO or subsequent dividend payments or sales of stock.

*Id.* § 9.5(b). This decision refers to this sentence as the "IPO Cooperation Clause."

Part (i) of the IPO Cooperation Clause obligates Williams to take such actions as may be reasonably requested by EnCap in connection with consummating the IPO Exchange. As discussed previously, EnCap is not carrying out the IPO Exchange. EnCap instead proposes to amend the Caiman LLC Agreement to authorize a different type of transaction. In the Up-C IPO that EnCap is seeking to implement, the membership interests in or assets of Caiman II are not being transferred to the IPO Issuer, and Caiman II is not merging or consolidating with the IPO Issuer. Part (i) of the IPO Cooperation Clause thus does not aid the defendants.

Part (ii)(x) of the IPO Cooperation Clause requires that Williams use commercially reasonable efforts to assist EnCap in undertaking the IPO Exchange in a tax-efficient

70

manner. Here again, EnCap is not undertaking the IPO Exchange. EnCap is trying to implement a different structure.

More generally, an obligation to take reasonable actions or use commercially reasonable efforts obligates a party "to take all reasonable steps to solve problems and consummate the transaction" on the terms set forth in the governing agreement. *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at \*91 (Del. Ch. Oct. 1, 2018) *(quoting Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017)), *aff'd*, 198 A.3d 724 (Del. 2018) (TABLE). It does not require a party "to sacrifice its own contractual rights for the benefit of its counterparty." *Id.* To the extent that Williams has rights under the Caiman LLC Agreement, such as a right to refuse to consent to amendments that are adverse to its interests, then Williams can stand on that right. EnCap cannot rely on the IPO Cooperation Clause to force Williams to waive or compromise its right.

## G.     The Stockholders Agreement

Blue Racer and First Reserve seek a declaration that they are not obligated to enter into a stockholders agreement with Williams that would replicate certain governance features of Caiman II in the context of PubCo. Nothing in the Caiman LLC Agreement requires a stockholders agreement. The parties may negotiate one if they choose, but there is no obligation to enter into one.

## III.     CONCLUSION

This decision has construed the plain language of the Caiman LLC Agreement and applied it to critical steps in the Up-C IPO. Because of the determinations made in this decision, EnCap cannot proceed with the Up-C IPO as currently structured. The parties

71

shall prepare a form of final order that implements the rulings made in this decision. If there are additional matters that must be addressed before a final order can be entered, the parties shall submit a joint letter within ten days that identifies the issues and proposes a path for bringing this matter to conclusion at the trial level.